# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *In re Jonathon C.B.*, 2011 IL 107750

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* JONATHON C.B., a Minor (The People of the State of Illinois, Appellee, v. Jonathon C.B., Appellant). |

| | |
|---|---|
| Docket No. | 107750 |
| Filed | June 30, 2011 |
| Rehearing denied | November 28, 2011 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where shackles were ordered removed when a juvenile was called to testify, but the record did not indicate that the judge was previously aware of them, there was no error in failure to hold a *Boose* hearing, and an adjudication for criminal sexual assault was upheld; and a claim that the Juvenile Court Act's denial of jury to minors violates the Illinois Constitution's guarantee of jury trial in criminal prosecutions was rejected. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Champaign County, the Hon. Heidi N. Ladd, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |

| | |
|---|---|
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Gary R. Peterson and Karen Munoz, Deputy Defenders, and Catherine K. Hart, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Michael M. Glick and Gopi Kashyap, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| Justices | JUSTICE THOMAS delivered the judgment of the court, with opinion, and wrote in support of denial of rehearing, joined by Justice Karmeier.<br><br>Justices Garman, Karmeier, and Theis concurred in the judgment and opinion.<br><br>Chief Justice Kilbride dissented, with opinion, and dissented upon denial of rehearing, with opinion.<br><br>Justice Freeman dissented, with opinion, and dissented upon denial of rehearing, with opinion.<br><br>Justice Burke dissented, with opinion, and dissented upon denial of rehearing, with opinion.<br><br>Justice Theis wrote in support of denial of rehearing. |

**OPINION**

¶ 1    Jonathon C.B. (Jonathon) was adjudicated a delinquent minor following the circuit court of Champaign County's finding that Jonathon was guilty of criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2006)) and attempted robbery (720 ILCS 5/8-4(a), 18-1 (West 2006)). The trial court ordered Jonathon committed to the Illinois Department of Juvenile Justice for an indeterminate term, to automatically terminate in 15 years or upon Jonathon attaining 21 years of age. On appeal, the appellate court affirmed the adjudication, with one justice dissenting. 386 Ill. App. 3d 735.

¶ 2    This court granted Jonathon's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We now affirm the judgment of the appellate court.

¶ 3                                  BACKGROUND

¶ 4    On August 24, 2006, the State filed a supplemental petition for adjudication of wardship, alleging that Jonathon, who was 16 years old at the time, was a delinquent minor, and charging him with criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2006)) and attempted robbery (720 ILCS 5/8-4(a), 18-1 (West 2006)). The State alleged that Jonathon

and another minor, G.W., sexually assaulted and attempted to rob C.H. Jonathon asserted that he and G.W. had paid C.H. for sex, then attempted to get their money back. Because Jonathon challenges the sufficiency of the evidence against him, we will review the facts of the case in detail.

¶ 5 At Jonathon's bench trial, C.H. testified that on July 10, 2006, she left her home on Comanche in Champaign, Illinois, around 11 or 11:30 p.m. to go to her friend Donnie Stewart's home to make a phone call. As she was walking, she was approached by two boys, a tall boy and a short boy. C.H. later identified Jonathon as the tall boy. The short boy said to her, "I have three for one." C.H. responded, "You should be at home in bed." Jonathon told C.H., "That is my brother. You don't talk to him like that." C.H. said, "Well, he approached me," then continued walking to Stewart's house. C.H. stayed at Stewart's house for around 10 minutes, but did not recall what time she left. C.H. took a different route home, along Campbell Street, because the boys that had approached her on her way to Stewart's house made her uncomfortable.

¶ 6 As C.H. was walking home, she heard footsteps behind her. She turned around and saw two boys behind her. One was Jonathon, and the other was a little shorter, but was not the same short boy from earlier. C.H. continued walking, and one of the boys said, "Hey, you." Jonathon went over to the garage of a duplex on Campbell, and asked C.H. if she wanted to have a drink. He also asked C.H. if she wanted to come near the garage. Jonathon went to the garage door and punched a button, raising the garage door. C.H. said, "I'm not going in there." Jonathon lowered the garage door and said that they could talk and drink at the back of the house. The shorter boy, later identified as G.W., then grabbed C.H.'s arm and pulled her behind the house.

¶ 7 G.W. put his hands on C.H.'s shoulders and pulled her to her knees. G.W. was facing C.H. G.W. unzipped his pants and "crammed" his penis in her mouth, telling her she better not bite it. Jonathon was behind her. C.H. felt Jonathon put his penis in her vagina. C.H. testified that she fought as much as she could, said "no," and tried to pull away. During the assault, C.H.'s blouse was torn. C.H. testified that there were people across the street, but no one helped.

¶ 8 C.H. testified that she was carrying a knife at the time of the assault, and that she had carried a knife ever since she was raped, beaten, and left for dead nine years earlier. C.H. said that the knife was in her hand. C.H. said that the knife was not open when G.W. grabbed her.

¶ 9 The assault was interrupted when a boy walking by said, "What are you all doing?" The boy scared G.W., who was holding C.H., so he let her loose. Jonathon also turned around, so C.H. knew it was her chance to get away. She ran south on Campbell. Her bra and shirt were torn, and she was trying to pull her pants up. C.H. screamed and asked people for help, but no one helped her. When she came to an intersection, C.H. saw her friend Keisha drive by in an orange- or gold-colored "truck like" car. C.H. ran up to the car and asked to be let in. Jonathon came up behind C.H. and told Keisha not to let C.H. in the car. Jonathon told Keisha that the police were down the street. Keisha did not let C.H. in the vehicle.

¶ 10 C.H. tried to run away again. When C.H. got to a tree in the back of her house, Jonathon hit her in the back of the head and knocked her down. C.H. then showed the knife she was

carrying. Jonathon told C.H. to "drop the knife," and held C.H.'s arm down with his foot. The shorter boy then began "stomping" her in the head. At that point, C.H. saw a light and heard a man's voice say, "Let her go." The boys then ran off. C.H. testified that the man was a police officer. An ambulance was on the scene because someone had called 911. The officer wrapped something around C.H. to cover her up. C.H. was screaming and yelling for the officers to get her fiancé, and kept telling them, "Don't touch me."

¶ 11    A female paramedic came out of the ambulance and put C.H. in the ambulance. The paramedic wrapped C.H.'s arm because it was bleeding. C.H. also kept saying that her stomach was hurting. C.H. refused to go to the hospital at that point because she "didn't want to go through everything that they told me I had to go through." C.H. told the female paramedic that she had been sexually assaulted, but did not tell the police officers that night. C.H. returned to her apartment with her fiancé, who had arrived on the scene.

¶ 12    After C.H. had returned to her apartment, police officers came to the door and asked if C.H. could identify the boys who had attacked and tried to rob her. The officers drove C.H. and her fiancé to 2701 Campbell, the duplex where the boys had grabbed her and assaulted her. C.H. identified the boys for the police.

¶ 13    At 8 a.m. the next day, detectives came to C.H.'s home. C.H. gave the detectives a bag containing the clothes she had been wearing during the attack. C.H. testified that she had prepared the bag based on her prior experience. The detectives insisted that C.H. go to the hospital to be examined, so they drove C.H. and her fiancé there.

¶ 14    Sarah Ramey testified that on July 11, 2006, she was employed by Arrow Carle Ambulance in Champaign. In the early morning hours, around 1:10 a.m., she was dispatched to the area of Campbell and Aztec. The fire department was already on the scene. C.H. was sitting on the side of the road, and the fire department had oxygen on her. Ramey said that C.H. was obviously hysterical. C.H. was screaming, "Don't touch me." C.H. did not want anyone around her. Ramey testified that C.H. was definitely more intimidated by the men on the scene.

¶ 15    At first, C.H. was saying that she just wanted to go home. Ramey asked C.H. to at least step into the ambulance with her so that Ramey could check her out. As Ramey and C.H. were walking to the ambulance, C.H. turned to Ramey and whispered, "I was raped." It was still hard to calm C.H. down in the ambulance. Ramey pleaded with C.H. to go to the hospital, but C.H. was adamant about wanting to go home. Ramey observed abrasions to both of C.H.'s elbows, as well as a shoe print on C.H.'s left arm and upper arm. C.H. also complained of tenderness in her abdomen, and screamed in pain when Ramey pushed on it.

¶ 16    Destiny Nesbitt testified that Jonathon is her cousin. In July 2006, Destiny lived in apartment A of a duplex at 2701 Campbell Drive. Jonathon was staying with her. Around 10:45 p.m. on July 10, Jonathon asked Destiny for $40. Jonathon said there were girls out in the neighborhood and he wanted some money so he could go outside. Destiny gave Jonathon the $40. Destiny then went to sleep around 11 p.m. Sometime later, a little after 1 a.m., Destiny's boyfriend had a telephone conversation with Jonathon. Destiny heard Jonathon tell her boyfriend that he no longer had the $40 because he had "hit a hype." Destiny then went outside to talk to Jonathon, who she believed was at apartment B of the

duplex. The police were outside her door.

¶ 17       Destiny testified that she rented the garage of the duplex. Destiny said that the garage does not have an electric button that makes the door raise and lower. Destiny used a key to get in the garage. The garage stays locked, and to enter it, Destiny would unlock the garage, turn the garage handle, and pull the door up. Jonathon did not have a key to the garage.

¶ 18       Deputy Andrew Good testified that he is employed by the Champaign County sheriff's office as a deputy sheriff. On July 10-11, 2006, Good was working the 11 p.m. to 7 a.m. shift as a patrol officer with his field training officer, Deputy Bragg. Around 1:15 a.m. on July 11, Good was on foot patrol responding to a call in the area of Comanche and Campbell. While responding to that call, Good heard screaming from what appeared to be multiple males and a female north on Campbell. As Good walked closer, he saw two males standing over a female screaming and striking her with their fists or hands. The males were saying something to the effect of, "Give me the money. Where is the bread? Give me the money." The female kept repeating, "Quit hitting me. I don't have any money." The female stood up and started running in the direction of Good and Bragg. The two males began chasing her. Good then drew his gun, pointed the gun and his flashlight in the direction of the people, identified himself, and told them to stop. The males immediately turned around and ran northbound in the opposite direction. Good radioed their description and began tending to the woman.

¶ 19       Good explained that the woman, C.H., had continued running toward him and had collapsed in the street near where he was standing. C.H. had on a green tank top which was torn at the shoulder. Her bra strap was also torn, and her pants were soiled around the crotch area. C.H. was "real hysterical." Good asked C.H. if she could move off the street, so C.H. crawled approximately six feet over to the grass area. Good said it was hard to get information out of C.H. because she was hysterical, but at first she said she was raped and that they had a gun. Good saw that C.H.'s elbows and arms had some scraping or scratches on them, and that her elbows were bleeding.

¶ 20       Good eventually was able to learn C.H.'s name and was able to get a description of where C.H. first encountered the boys, at a duplex up the street, on the left side, with a big tree in the yard. Good then proceeded to 2701 Campbell, which fit C.H.'s description. When he arrived on the scene, other deputies were there. Good helped them secure the perimeter around the residence. Later, Good went into apartment B and saw one of the suspects, G.W., being taken into custody. Good and another officer went into another room and saw Jonathon and took him into custody.

¶ 21       Good was present when C.H. was brought to the scene for the "show up" identification. C.H. identified Jonathon and G.W. as her attackers. Good testified that during the course of the show up, Jonathon was kind of talking to himself, saying something to the effect of, "We just went up to help her. We saw the police and we ran." Good testified that in his report of the incident, he noted that there were two suspects, Jonathon and G.W. The report indicated that G.W.'s height was five feet, five inches, and his weight was 160 pounds. Jonathon's height was five feet, two inches, and his weight was 115 pounds.

¶ 22       Deputy Norman Meeker testified that he was a deputy sheriff with the Champaign County sheriff's office. Meeker was on patrol from 11 p.m. July 10 to 7 a.m. July 11, 2006.

On that date, Meeker was dispatched to the area of Campbell and Aztec to locate two suspects in connection with a possible armed robbery. When Meeker was approximately three blocks north of the scene, he got out of his car and began walking south toward the scene on Campbell. As Meeker walked by 2701A Campbell, he heard someone talking on the phone say that "they better have their forty dollars." Meeker became suspicious and backed away from the residence. Meeker told the other units that he needed someone to respond there with him.

¶ 23    Meeker eventually spoke with Destiny Nesbitt. Nesbitt told Meeker that she was going next door to get her cousin, Jonathon. Destiny told Meeker that she was supposed to be watching Jonathon, and around 1:15 in the morning received a call from him saying that he had just "hit a hype." Destiny said that Jonathon had called from the duplex on the north side of the building, 2701B Campbell. When Meeker told Destiny that he had overheard her telephone conversation about the $40, Destiny said that she had given or loaned Jonathon $40 earlier in the evening, and that Jonathon said he did not have the money, but was going to get it back for her.

¶ 24    Meeker testified that other officers arrived and set up a perimeter. After about an hour, around 2:15 a.m., G.W. opened the door for the officers and was placed in handcuffs. Jonathon eventually came out of another room and was apprehended. Meeker was with Jonathon when the show up identification took place. Jonathon spontaneously told Meeker that they were just walking with the victim. After C.H. identified G.W. and Jonathon as her attackers, they were arrested.

¶ 25    Meeker interviewed Jonathon at the detention center. Jonathon told Meeker that earlier in the evening, C.H. had approached him up the street from 2701 Campbell and said that she wanted to sell a television. Jonathon told C.H. that he did not have any money, and then they had a conversation that maybe she could do something else for money, which Jonathon took to mean that she would have sex for money. Jonathon told C.H. that he had a friend, and she said that was okay. Jonathon then called G.W., and got $40 from his cousin.

¶ 26    Jonathon, G.W. and C.H. then went behind 2701, where he and G.W. had sexual relations with C.H. Jonathon said that at one point, C.H. fell over and cut herself. C.H. tore her shirt and maybe her bra when she fell over. C.H. then became upset and wanted the boys to walk her home so that her husband would not be mad. Jonathon said that after they had gone about a block, C.H. "freaked out," yelling and screaming. She also pulled out a box cutter or something like a box cutter. At that point, Jonathon saw the police shine their flashlights on him, so he and G.W. took off running. Jonathon told Meeker he ran because it was "instinct."

¶ 27    Meeker testified that Jonathon's narrative concerning the sexual relations with C.H. changed several times. Jonathon first said that he started to have oral sex with C.H. and G.W. had sexual intercourse with her. Jonathon then said that he never actually was able to have sex with C.H. because she fell over. Jonathon's last version of the events of the evening was that C.H. was walking down the street, so he and G.W. started to follow her because they wanted to get their $40 back. Around the area of Campbell and Aztec, G.W. hit C.H. and knocked her down, then started to search her for the money. Jonathon said he never hit C.H.,

-6-

and that they were trying to get their money when the police arrived.

¶ 28    Sergeant Gregory Mills of the Champaign County sheriff's office testified that on the evening of July 11, 2006, he went to C.H.'s home with his partner and took photographs of her injuries. One photo of C.H.'s left hand and wrist area showed slight abrasions and swelling. Another photo showed an injury to her left elbow.

¶ 29    Curtis Apperson testified that he is an investigator with the Champaign County sheriff's department. On July 11, 2006, he went to C.H.'s home to interview her concerning an armed robbery. During his conversation with C.H., C.H. told Apperson that she had been raped. Apperson collected C.H.'s clothes from the night before, and took her to Provena Medical Center. Apperson testified that when C.H. told him that she had been raped, she was emotional and had tears coming from her eyes. C.H. told Apperson that the "tall one did it." When Apperson asked C.H. why she did not tell the police earlier about what had happened, C.H. said she had been the victim of rape in the past and felt that the police officers involved in that investigation did not believe her, so she did not think it would go anywhere if she told any of the officers the night before about the rape. C.H. did say that she told a female paramedic or firefighter that she had been raped. Apperson continued interviewing C.H. at the hospital. Apperson said that C.H.'s emotions were "up and down." At times C.H. was calm, and other times she was emotional and crying.

¶ 30    On cross-examination, Apperson testified that C.H. told him she had a knife on her that evening that she carries for protection. C.H. also told Apperson that $50 was taken from her, two twenties and two fives. C.H. told Apperson that she had been at two places earlier in the evening: Antoine's house and Donnie's house; and that at one of the places she had a birthday drink. Apperson said it was very hard to talk to C.H. because of her emotions, so it was not exactly clear if she went to Antoine's first and then went to Donny's house. At the hospital, Apperson told C.H. that the two suspects said that they had paid her to have sex. At that point, C.H. became very emotional and made statements to the effect of "Well, here we go again," or "You're not gonna believe me." Apperson thought C.H. had told him that the two boys took $50 from her. C.H. did not tell Apperson that either of the suspects had a weapon. She said that they forced her to the ground and forced her to have sex.

¶ 31    William Davis testified that he was an investigator with the Champaign County sheriff's office. On July 11, 2006, Davis accompanied Apperson to C.H.'s house to conduct an interview. Davis said that C.H. told them that she had been approached by three people asking her for three for one, or something like that. C.H. thought they were talking about drugs and said she did not do that. C.H. continued to walk to her friend's house. Davis believed C.H. said she was going to get a birthday drink at a friend's house, and that she needed to get back home to her fiancé, otherwise he might be mad. Davis thought C.H. said she had the drinks at Anthony's or Antoine's house. Davis testified that C.H. did not mention Donny to him. While C.H. was going back home, she was approached by two of the three boys she had seen earlier. One of the boys started pulling her shirt off. Davis said that C.H. started to break down and cry when she told them that the boy started pulling her shirt off. At that point, C.H. told them that she had been raped. Apperson then asked her to go to the hospital to have a rape kit done.

¶ 32    At the hospital, Davis asked C.H.'s fiancé, Major Nixon, whether C.H. had any money. Major Nixon did not recall C.H. having any money on her. When the interview with C.H. resumed at the hospital, Apperson told C.H. that the two boys said they had paid C.H. for sex. C.H. became very emotional and upset, and could not "believe this is gonna happen again. She didn't want to go through this again."

¶ 33    Mary Sexton testified for the defense that she was a registered nurse at Provena Covenant Medical Center. Sexton was working in the emergency room on July 11, 2006, and did the initial exam and sexual assault kit on C.H. Sexton's history and physical notes indicated that C.H. said that the previous evening, she was walking back from her friend's house. Her friend was not at home. Some young kids tried to talk to C.H. C.H. told Sexton that two people sexually assaulted her. C.H. told Sexton that she was screaming for help, and indicated that afterward, she had seen a small black handled gun. C.H. said that she had a small knife that she carried with her, but the boys took it away from her. C.H. had a small abrasion on her elbow.

¶ 34    On cross-examination, Sexton testified that C.H. told her that one of the boys kept kicking her in the head. C.H. also told Sexton that one of the boys was standing on her arm. C.H. said that she told one of the emergency medical technicians at the scene that she had been raped and that she did not want to go to the hospital that night. C.H. also said that one of the boys held her by her shoulder.

¶ 35    The defense recalled Destiny Nesbitt to the stand. Destiny testified that her bedroom had a window facing the backyard. Destiny said that she went to bed at 11 p.m. on July 10, 2006, and did not hear any commotion, screams or noises that night. Destiny also testified that the garage to the duplex that she rented was locked. The garage door was not automatic, but was one that you pulled up. Jonathon told Destiny that he and G.W. had paid a prostitute $40 for some sex and some oral sex, but she did not finish whatever she was supposed to do, so they were trying to take their money back. Jonathon told Destiny's boyfriend that they were hitting her trying to get their money back. Jonathon said they were "hitting a hype," which meant a drug addict.

¶ 36    Jonathon testified that he was staying with his cousin Destiny Nesbitt on July 10-11, 2006. G.W. was a friend that lived next door to Destiny. Jonathon first encountered C.H. around midnight on July 10. Jonathon was with G.W.'s younger brother when C.H. approached him and said that she was selling a television. C.H. asked if the boys wanted to buy a television. Jonathon said "no." C.H. did not have a television with her at the time. C.H. then asked Jonathon if he had any money. Jonathon again said "no," and C.H. asked him if he sold drugs or had any drugs. Jonathon said "no," and C.H. asked him if she could do anything for some money. Jonathon then called G.W. and G.W. came down. Jonathon testified that this occurred between 12 and 12:30 a.m.

¶ 37    Jonathon then asked Destiny for $40, telling her he wanted the money so he could impress some girls. The reason Jonathon wanted the money was because C.H. had told Jonathon that she would have sex with them for $20 apiece. Jonathon testified that there was a group of between 9 to 12 people outside a home across the street. When Jonathon came back outside, he gave G.W. $20 and kept $20. C.H. and G.W. had decided that G.W. would

go first, so G.W. and C.H. went behind the house where G.W. had sex with C.H. Jonathon did not see G.W. give C.H. the $20. G.W. came back after 5 or 10 minutes and handed Jonathon a condom.

¶ 38 Jonathon then went behind the house and gave C.H. $20. C.H. first gave Jonathon oral sex for about two minutes. C.H. then pulled down her pants and hunched over. C.H.'s hands were on the ground, but her knees were not on the ground. Jonathon entered C.H. from behind. As he was having sex with C.H., he grabbed her by the shoulders and her bra strap "kind of tore." C.H. lost her balance and slipped, scraping her elbow. C.H. then got up and was crying. Jonathon did not get to finish having sex with her. C.H. asked him to walk her home because her boyfriend was going to be mad that she did not come straight home, and would beat her.

¶ 39 As Jonathon and G.W. were walking C.H. home, they decided to get their money back. Jonathon said that C.H. pulled a knife. Jonathon told her to calm down and put the knife down. C.H. put the knife away, although Jonathon did not see where C.H. put it. C.H. was still crying hysterically. G.W. then shoved C.H. down, and Jonathon stepped on her arm so that she would not try to go for the knife again. While Jonathon had his foot on C.H.'s arm, G.W. searched her but did not find any money. C.H. twice yelled for help. G.W. asked, "Where's the money? Where's the bread?" At that point, the police officer flashed his light and the boys ran to G.W.'s house.

¶ 40 Takesha Williams testified that she knew C.H. because they had lived at the same apartment complex a few years earlier. Williams testified that on the night of July 10-11, 2006, she was at home with her two boys. Williams owned an orange 2003 Pontiac Aztec, which is a combination van and truck. Williams denied being approached by C.H. on the night of July 10-11, and said that she was at home with her children. She testified that she never would have been out that time of night.

¶ 41 Following closing arguments, the trial judge found respondent guilty of criminal sexual assault and attempted robbery. Respondent was adjudicated delinquent and committed to the Illinois Department of Juvenile Justice for an indeterminate term to automatically terminate in 15 years, or upon Jonathon turning 21 years of age.

¶ 42 Jonathon appealed, arguing that the State failed to prove him guilty of criminal sexual assault beyond a reasonable doubt, that the trial court violated his due process rights under the fourteenth amendment because he was shackled without an individualized determination of necessity, and that juveniles charged with sex offenses have a constitutional right to a jury trial. The appellate court affirmed, with one justice dissenting. 386 Ill. App. 3d 735.

¶ 43 The dissenting justice stated that failing to hold a *Boose* hearing in this case was plain error because the evidence was closely balanced. 386 Ill. App. 3d at 751 (Appleton, P.J., dissenting). The dissent also would hold that section 5-101(3) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-101(3) (West 2006)), as applied to juveniles charged with sex offenses, is unconstitutional because it denies juveniles the right to a jury trial. 386 Ill. App. 3d at 751 (Appleton, P.J., dissenting).

¶ 44                                    ANALYSIS

¶ 45        On appeal, Jonathon again raises the three issues that he raised in the appellate court. As in the appellate court, Jonathon only challenges his conviction for criminal sexual assault, conceding that the evidence was sufficient to support his conviction for attempted robbery. Jonathon contends that: (1) the trial court erred in finding him guilty of criminal sexual assault because he was not proven guilty beyond a reasonable doubt; (2) he is entitled to a new trial because he was shackled during his trial without a *Boose* hearing; and (3) section 5-101(3) of the Act, which denies minors the right to a jury trial, is unconstitutional, at least as applied to minors charged with sexual offenses.

¶ 46        With regard to his claim that the State did not prove him guilty of criminal sexual assault beyond a reasonable doubt, Jonathon argues that the trial court acted unreasonably when it ignored the weaknesses in C.H.'s testimony. Jonathon asserts that the trial court bolstered the testimony of C.H. by asking "Why would the victim lie?" rather than accepting that sometimes victims do lie. Jonathon claims that on six separate occasions, the trial court ignored or undermined testimony that contradicted C.H.'s statements, or brushed aside evidence supporting Jonathon's testimony in favor of C.H.'s version of events.

¶ 47        When considering a challenge to the sufficiency of evidence, a reviewing court applies a reasonable doubt standard. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). The reasonable doubt standard applies in delinquency proceedings, requiring the State to prove the elements of the substantive offenses alleged in the delinquency petitions beyond a reasonable doubt. *In re W.C.*, 167 Ill. 2d 307, 336 (1995). The reasonable doubt standard asks whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* The reasonable doubt standard applies in all criminal cases, whether the evidence is direct or circumstantial. *Campbell*, 146 Ill. 2d at 374.

¶ 48        Jonathon admits that he had sexual relations with C.H., but contends that the sexual relations were consensual and that he paid her for the sex. Jonathon argues that the trial court erroneously failed to acknowledge that C.H.'s statements changed over time, and instead blamed the inconsistencies on uncertainties in the investigating officers' testimony. As noted, Jonathon points to instances where, he contends, the trial court ignored or undermined testimony that contradicted C.H.'s statements, and instead explained away the problems in her testimony.

¶ 49        Specifically, Jonathon observes that there were inconsistencies concerning where C.H. was going on the night of July 10, with Apperson and Davis testifying that when they interviewed C.H. at her house, C.H. said she was at Antoine's house, but at the hospital, C.H. said she went to Donny's house. C.H. also mentioned having a birthday drink at Antoine's house. Jonathon argues that the trial court blamed these inconsistencies on the investigators' testimony, stating:

            "It appears from the testimony of [C.H.] that she commenced her journey to Mr. Stewart's house at 11:00 to 11:30 p.m. There was reference in [defense counsel's] argument that we don't know if it was Mr. Stewart or Antwone [*sic*]. The testimony that was elicited from the investigator's about Antwone [*sic*] was never that clear,

and the investigators conceded they did not know if that was an earlier visit she made or if it was an earlier drink that she had but it was certainly nothing so definite as to impeach [C.H.] who testified consistently that she went to the residence of Donnie Stewart."

¶ 50    Jonathon next notes that C.H. claimed she left for Donnie's house at 11:30 and stayed only for approximately 10 minutes, yet the ambulance did not respond to the scene until 1:10 a.m., leaving a considerable unexplained gap of time. Jonathon also claims there are inconsistencies concerning where C.H. first encountered Jonathon and G.W. Jonathon states that Investigator Davis testified that C.H. said that she initially encountered three boys, but C.H. later testified that she first encountered two boys.

¶ 51    Moreover, C.H. testified that Jonathon was pushing a button, making the garage door go up and down, even though the door had to be manually opened. Jonathon asserts that the trial court discounted the discrepancy, stating that:

> "With respect to the issue of the garage door, the Court does not view that as determinative. ***
>
> We do know that [C.H.] believed that [Jonathon] opened the garage door, it's not clear if it was a few inches or a few feet or in total, and that he was working the garage door. There is no reason for [C.H.] to make that up as [defense counsel] concedes. It may have been that she assumed he was raising the button. He may have had access to unlock the door. But it really is a non-issue. The Court doesn't have any information sufficient to make it an issue and, frankly, it's a collateral matter.
>
>    ***
>
> There would be no reason for [C.H.] to make that up, and it may well have been a perception. I don't think anyone is paying careful attention to the mechanism that operates a garage door when the events are on the discussions and what took place."

¶ 52    Jonathon further observes that the trial court made a point of mentioning C.H.'s small stature as "an average to smaller woman" and then stating that C.H. described events "where two average-sized 16 year young men dragged her back behind a duplex and overcame her acting jointly. Certainly that would support the contention that force was used for the purpose of the statute." Jonathon points out, however, that Deputy Good's police report describes G.W. as being five feet, five inches, and 160 pounds, and Jonathon as five feet, two inches, and 115 pounds.

¶ 53    Jonathon next contends that the trial court simply accepted C.H.'s testimony that there were many people out on the street who did not respond to her cries for help. Jonathon notes that the State did not produce a single witness to support that claim. Nonetheless, the trial court in reviewing that testimony stated:

> "[C.H.] said there were people in the area and so did [Jonathon] in his testimony. In fact, there appeared to be a large number of people across the street. [C.H.] said no one responded to help. Again the Court would question why she would make that up since clearly that would hurt her claim."

¶ 54    Jonathon suggests that, contrary to the trial court's conclusion, perhaps no one helped

C.H. because there was no sexual assault.

¶ 55 Jonathon argues there are other inconsistencies, including the fact that the State presented no evidence to rebut the fact that Takesha was the Keisha referred to in C.H.'s testimony. Jonathon states that here, too, the trial court discounted Takesha's testimony. With regard to Takesha's testimony, the trial court held:

"It was never definitively established that Takeisha [*sic*] Williams is the same Keisha that [C.H.] referred to. ***

This Court doesn't know if Ms. Williams is the same person. Certainly there is a persuasive argument that she is. Assuming that she is for the purposes of this Court's analysis this Court must then query why [C.H.] would make that up. Either Ms. Williams or [C.H.] is lying. For [C.H.] to make that up hurts her case. Why not just say a truck drove by with people and they refused to stop? By giving specifics *** [C.H.] was supplying a roadmap to a witness who would potentially contradict and impeach her statement. The Court has to question why she would do that if it didn't happen.

On the other hand, if it did happen, Keisha Williams certainly has every reason in the world for denying that she was there given her less than heroic response to the events that were occurring. I find [C.H.] had no reason to make it up. Certainly Ms. Williams had reasons to deny that it occurred."

¶ 56 Jonathon next raises the inconsistencies concerning whether any money was actually stolen from C.H. and concerning how much money C.H. had with her. The trial court pointed out that Investigator Apperson testified that he believed C.H. said that $50 was taken from her–two twenties and two fives–while Investigator Davis did not recall that being discussed. The trial court noted that "[C.H.] was never asked about it in her testimony nor confronted with it on cross examination, has never been asked to explain it. She did state that she could not recall everything that she told the investigators."

¶ 57 Finally, Jonathon questions whether there was a gun on the night of July 10-11, and if not, asks why C.H. lied about it. Mary Sexton and Deputy Good both testified that C.H. told them that the boys had a gun, yet C.H. never testified that the boys had a gun, and there was no other evidence of a gun. In reviewing Sexton's testimony, the trial court stated:

"Ms. Sexton testified at length in these proceedings and the Court was not particularly impressed with her. She struck the Court as a terse, rather glum, not particularly compassionate emergency room nurse ***.

The Court is bothered by one factor, and that is the statement made to Mary Sexton, the RN, which was documented in her notes. She appeared to have no independent recall of this, and that was [C.H.'s] claim that a small black-handled gun was displayed. No other details. The Court has analyzed that carefully because that is a key factor in terms of different testimony or statements from anything else that's been elicited. [C.H.] never said that to anyone else. There is no evidence she told the investigators that although they also interviewed her at the hospital. Ms. Sexton was not able to put it in context. She simply read that statement from her notes, and [C.H.] was never confronted with that in her testimony or asked to explain it. ***

-12-

>If [C.H.] said it, it's troubling because there is no other suggestion a gun was used and [C.H.] did not testify to that. One conclusion is that there was a gun, and I find that unsupported by the evidence. Another conclusion is that [C.H.] lied about that and, therefore, is lying about everything. Another conclusion is that [C.H.] enhanced her testimony or her description rather to Mary Sexton in an attempt to make her complaint of rape more believable since she was haunted by the fact that she was not believed nine years earlier and was trying to again enhance or make it more believable that force was used. Another conclusion is that Mary Sexton either misunderstood or inaccurately documented statements about the small black-handled knife. ***
>
>But giving careful consideration to that evidence I simply can't draw any conclusions."

¶ 58   Jonathon contends that the preceding inconsistencies establish that C.H. lied about the sexual assault rather than admit that she had just committed the crime of prostitution with two underage boys, who then attacked her in an effort to get their money back. Nonetheless, rather than accept that C.H. was lying about the sexual assault, the trial court explained away the problems with C.H.'s testimony. Jonathon argues that the serious flaws in the State's case are set forth in the trial court's findings of fact, and that the trial court therefore acted unreasonably when it ignored all of the weaknesses in C.H.'s story and instead found C.H. to be credible, asking why the victim would lie.

¶ 59   This court will not retry a defendant when considering a sufficiency of the evidence challenge. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court that saw and heard the witnesses. *Id.* at 114-15. It also is for the trier of fact to resolve conflicts or inconsistencies in the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Nonetheless, while a trier of fact's decision to accept testimony is entitled to deference, it is neither conclusive nor binding. *Wheeler*, 226 Ill. 2d at 115.

¶ 60   The trier of fact, however, need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. *Campbell*, 146 Ill. 2d at 380. Rather, it is sufficient if all the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the accused's guilt. *Id.* A trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt. *Id.* "A conviction will not be reversed 'simply because the defendant tells us that a witness was not credible.' " *People v. Brown*, 185 Ill. 2d 229, 250 (1998) (quoting *People v. Byron*, 164 Ill. 2d 279, 299 (1995)).

¶ 61   With the foregoing principles in mind, we find that, viewing the evidence in a light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The elements of criminal sexual assault are set forth in section 12-13(a)(1) of the Criminal Code of 1961 (720 ILCS 5/12-13(a)(1) (West 2006)). That section provides:

>"(a) The accused commits criminal sexual assault if he or she:

(1) commits an act of sexual penetration by the use of force or threat of force ***." 720 ILCS 5/12-13(a)(1) (West 2006).

¶ 62    Despite the inconsistencies concerning events collateral to the criminal sexual assault, the testimony of C.H. and the other witnesses was consistent concerning the sexual assault. C.H. testified that G.W. grabbed her and pulled her behind the duplex, pushed her down and crammed his penis into her mouth, telling her not to bite it. Jonathon then inserted his penis into her vagina from behind. C.H. reported to Officer Good and paramedic Ramey that she had been raped, and both witnesses described C.H. as emotional and hysterical. Deputy Good testified that C.H.'s shirt and bra strap were torn, and it looked like she had soiled herself in the crotch area of her pants. Deputy Good also testified that C.H. had abrasions on her elbows and arms. C.H. also reported the criminal sexual assault to Mary Sexton and to investigators Apperson and Davis. When Apperson and Davis told C.H. that the boys claimed they had paid her for sex, C.H. became very upset and said, "Here we go again."

¶ 63    In contrast, as the trial court found, Jonathon's statements concerning the sexual encounter with C.H. were not consistent. When being brought for the show up, Deputy Good testified, Jonathon said, "We just went up to help her. We saw the police and ran." Jonathon made a statement to Deputy Meeker after he was secured that he and G.W. were just walking with C.H. Later, at the Youth Detention Center, Jonathon told Deputy Meeker that C.H. came up to him and wanted to sell him a television, then they discussed what else she could do for money. Jonathon first told Deputy Meeker that he started to have oral sex with C.H., and that G.W. had sexual intercourse with her. Jonathon then said that he was never able to actually have sexual intercourse with C.H. because she fell over. Jonathon said that when C.H. fell over, she cut herself, tearing her shirt and maybe her bra. At trial, Jonathon testified that C.H. first gave him oral sex, then pulled down her pants and hunched over. Jonathon testified that he put his penis in C.H.'s vagina from behind, and while he was having sex with her, he grabbed her by the shoulders and her bra strap "kind of tore." At that point, C.H. lost her balance and slipped, scraping her elbow. Jonathon testified that he did not get to finish having sex with C.H., and that C.H. asked him to walk her home.

¶ 64    The trial court, who saw and observed the witnesses and their demeanor, found C.H.'s testimony concerning the criminal sexual assault to be credible. The evidence, taken together, was sufficient to satisfy the trial court beyond a reasonable doubt of Jonathon's guilt. The trial court's finding was not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of Jonathon's guilt of criminal sexual assault. We therefore find that the appellate court properly affirmed the trial court's finding that Jonathon was guilty of criminal sexual assault.

¶ 65    Jonathon next argues that he is entitled to a new trial because he was shackled during his trial even though the trial court never held a *Boose* hearing to determine whether restraints were necessary. Jonathon concedes that neither he nor his counsel objected to the shackles and did not request a *Boose* hearing. Jonathon argues, however, that the unnecessary shackling of a minor so offends basic notions of justice that courts have a *sua sponte* duty to conduct a *Boose* hearing whenever a child appears in court in shackles. Therefore, the trial court's failure to *sua sponte* order the removal of Jonathon's restraints or to hold a *Boose* hearing should be deemed *per se* reversible error.

¶ 66    In the alternative, Jonathon argues that this court should review the issue as a matter of plain error. Jonathon contends that the use of physical restraints at trial was inherently prejudicial, so he need not prove actual prejudice in order to receive a new trial. Jonathon further argues that because the evidence in this case was so closely balanced, it is impossible to conclude that the shackling had no adverse effect on the proceedings.

¶ 67    In *People v. Boose*, 66 Ill. 2d 261, 265 (1977), the court held that the shackling of an accused should be avoided if possible because shackling: (1) tends to prejudice the jury against the accused; (2) restricts the accused's ability to assist his counsel during trial; and (3) offends the dignity of the judicial process. Therefore, *Boose* held that an accused should not be kept in restraints while in court and in the presence of the jury unless there is a manifest need for such restraints. *Id.* at 265-66. The *Boose* court set out factors to be considered by the trial judge in making his determination, and stated that the record should clearly disclose the reason underlying the trial court's decision for the shackling, and show that the accused's attorney was given an opportunity to oppose this decision. *Id.* at 266-67.

¶ 68    Thereafter, in *In re Staley*, 67 Ill. 2d 33 (1977), the court extended *Boose* protections to juveniles being tried in delinquency proceedings. The *Staley* court noted that there is no jury trial in delinquency proceedings, but pointed out that the "possibility of prejudicing a jury, however, is not the only reason why courts should not allow the shackling of an accused in the absence of a strong necessity for doing so." *Id.* at 37. An accused also has the right to stand trial " 'with the appearance, dignity, and self-respect of a free and innocent man.' " *Id.* (quoting *Eaddy v. People*, 174 P. 2d 717, 719 (Colo. 1946)). The court also noted that shackling restricts the ability of an accused to cooperate with his attorney and to assist in his defense. *Id.* Therefore, the reasons for forbidding shackling were not limited to trials by jury. *Id.*

¶ 69    As noted, Jonathon claims *per se* reversible error or, alternatively, plain error, based upon the fact that he was shackled during trial even though the trial court never held a *Boose* hearing to determine whether restraints were necessary. We first consider Jonathon's claim that his shackling constituted plain error.

¶ 70    It is well settled that the plain-error doctrine allows a reviewing court to consider unpreserved error when: (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) a clear or obvious error occurred, and the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). However, in addressing a plain-error argument, this court first considers whether error occurred at all. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008).

¶ 71    Jonathon argues that he was shackled throughout his trial, pointing to the appellate court dissent in this case, where Presiding Justice Appleton stated that, "in the circuit court of Champaign County, defendants wear chains as a seeming matter of course." See 386 Ill. App. 3d at 752 (Appleton, P.J., dissenting). However, the only reference to shackling in the record appears when Jonathon was called to testify. At that point, the trial court stated: "Okay. You may step up. You may take off the shackles. Sir, you may go ahead and approach the bench."

There is nothing in the record to show that the trial judge was even aware of the shackles before Jonathon was called to testify, nor is there evidence in the record that the shackles were put back on when Jonathon finished his testimony.

¶ 72   This court presumes that a trial judge knows and follows the law unless the record affirmatively indicates otherwise. *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996). Here, there is no affirmative indication in the record that the trial court was aware of the shackles before Jonathon was called to testify, so we presume that the trial court acted properly and did not commit error with regard to Jonathon's shackling.

¶ 73   In so holding, we note that the appellate court dissent believed the fact that the trial court directed that the shackles be removed from Jonathon during his testimony implied that the trial court was in a position to observe Jonathon's shackling prior to that time. See 386 Ill. App. 3d at 752 (Appleton, P.J., dissenting). Similarly, Jonathon supports his error claim by citing a Juvenile Defense Assessment Report, released in October 2007, finding that in half of the counties it visited, juveniles were shackled as a standard policy without any individualized determination that the juvenile posed a security risk. The positions of both the appellate court dissent and Jonathon, however, are based solely upon speculation. We decline to so speculate, and instead follow well-settled case law and presume that the trial court knew and followed the law with regard to shackling.

¶ 74   It is well settled that whether a defendant should be shackled is a determination within the discretion of the circuit court. *People v. Buss*, 187 Ill. 2d 144, 216 (1999). Thus, a "trial court should state for the record its reasons for allowing the defendant to *remain* physically restrained, and it should give the defendant's counsel an opportunity to present reasons why the defendant should not be restrained." (Emphasis added.) *People v. Allen*, 222 Ill. 2d 340, 348 (2006). However, it is axiomatic that in order to determine whether a defendant should *remain* physically restrained, a circuit court must first *know* that a defendant has been physically restrained. The error is in allowing a defendant to remain shackled without conducting a *Boose* hearing. In this case, there is no indication that the trial court knew that Jonathon was shackled before Jonathon was called to testify. At that point, the trial court directed that the shackles be removed, and there is no indication in the record that Jonathon thereafter *remained* shackled. Absent any evidence in the record that, upon becoming aware of the shackles, the trial court allowed Jonathon to remain shackled without conducting a *Boose* hearing, we cannot assume that the trial court erred in allowing Jonathon to remain shackled without conducting a *Boose* hearing. Based upon the record before us then, we find that the trial court did not err in this case. Consequently, we need not reach either of Jonathon's arguments.

¶ 75   Justices Freeman and Burke, in their respective dissents, take issue with this holding. Justice Freeman argues that "[i]t strains credulity that the trial judge did not learn that Jonathon was shackled in her courtroom until the third court day of the proceedings." *Infra* ¶ 134 (Freeman, J., dissenting). Justice Freeman would find that "the more realistic inference from the record is that the trial court was aware of Jonathon's shackles during the juvenile proceeding because the trial court directed that Jonathon's shackles be removed when he testified." *Id*.

¶ 76    Justice Freeman's inference, however, is just that: his inference. The record does not reveal whether Jonathon was present and seated in the courtroom when the trial judge entered, and does not reveal whether Jonathon's shackles were visible to the trial judge prior to the time that Jonathon was called to testify. As discussed, because there is nothing in the record to indicate that the trial judge was aware of the shackles before Jonathon was called to testify, we elect to apply well-settled law and presume that the trial judge knew and followed the law concerning shackling absent any *affirmative* evidence in the record to the contrary. In so holding, we reaffirm our case law that if a trial court *is aware or becomes aware* that a defendant, whether an adult or a juvenile, is shackled, the trial court must conduct a *Boose* hearing to determine whether there is a manifest need for the restraint.

¶ 77    Justice Burke states that we have placed the onus on Jonathon to show that the trial court was aware he was wearing shackles. *Infra* ¶ 168 (Burke, J., dissenting). Again, however, a trial court necessarily must be *aware* that a defendant is wearing restraints in order to conduct a *Boose* hearing. The *Boose* error then arises when a trial court allows a defendant to remain shackled without conducting a *Boose* hearing.

¶ 78    Jonathon next contends that section 5-101(3) of the Act (705 ILCS 405/5-101(3) (West 2006)) is unconstitutional because it denies juveniles the right to a jury trial. Jonathon argues that section 5-101(3) is unconstitutional under article I, section 8, of the Illinois Constitution of 1970. In addition, Jonathon argues that, as applied to juveniles charged with sex offenses, section 5-101(3) is unconstitutional under the due process and equal protection clauses of the Illinois and United States Constitutions.

¶ 79    Statutes are presumed constitutional and the party challenging the statute has the burden of demonstrating a clear constitutional violation. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 200 (2009). This court, then, will construe a statute to affirm its constitutionality if reasonably possible, and will resolve any doubt on the construction of a statute in favor of its validity. *People v. Boeckmann*, 238 Ill. 2d 1, 6-7 (2010). Our review of a constitutional challenge to a statute is *de novo*. *In re Lakisha M.*, 227 Ill. 2d 259, 263 (2008).

¶ 80    Section 5-101(3) provides:

> "(3) In all procedures under this Article, minors shall have all the procedural rights of adults in criminal proceedings, unless specifically precluded by laws that enhance the protection of such minors. Minors shall not have the right to a jury trial unless specifically provided by this Article." 705 ILCS 405/5-101(3) (West 2006).

The Act specifically provides juveniles the right to a jury trial in only three instances. A juvenile has the right to a jury trial when: he is tried under the extended juvenile jurisdiction provision (705 ILCS 405/5-810 (West 2006)); he is tried as a habitual juvenile offender (705 ILCS 405/5-815 (West 2006)); or he is tried as a violent juvenile offender (705 ILCS 405/5-820 (West 2006)).

¶ 81    With regard to his claim that section 5-101(3) is unconstitutional under article I, section 8, of the Illinois Constitution, Jonathon concedes that this court previously has rejected that argument. However, Jonathon contends that punishment and public safety are now the purpose and policy of the Act, so that a conclusion that juvenile proceedings are not criminal is incorrect. Jonathon asserts that virtually every adversarial procedure utilized in adult

proceedings has been imported into the juvenile system. Jonathon maintains that juveniles are subjected to criminal prosecutions which result in convictions and sentences of incarceration; therefore, juveniles are entitled to a jury trial under article I, section 8, of the Illinois Constitution.

¶ 82     Article I, section 8, of the Illinois Constitution provides:

> "In criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel; to demand the nature and cause of the accusation and have a copy thereof; to be confronted with the witnesses against him or her and to have process to compel the attendance of witnesses in his or her behalf; and to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." Ill. Const. 1970, art. I, § 8.

¶ 83     This court first considered whether juveniles are entitled to jury trials in *In re Fucini*, 44 Ill. 2d 305 (1970). There, the minor challenged the constitutionality of the Act, alleging the Act violated the sixth and fourteenth amendments to the United States Constitution, and article II, section 5, of the Illinois Constitution of 1870, because the Act did not provide a juvenile with a jury trial in a delinquency proceeding. *Fucini* held that the due process clause of the fourteenth amendment did not require that a jury trial be extended to juvenile court proceedings. *Id.* at 308. The court also held that the Act did not violate article II, section 5, of the Illinois Constitution of 1870. *Id.* at 310. The court held that:

> "proceedings under the Act were not 'according to the course of the common law in which the right of a trial by jury is guaranteed, but the proceeding is a statutory one, and the statute *** [was] enacted since the adoption of the constitution. There was not, at the time of such adoption, the enjoyment of a jury trial in such a case.' " *Id.* at 310 (quoting *Lindsay v. Lindsay*, 257 Ill. 328, 335-36 (1913)).

¶ 84     The court thereafter reaffirmed its holding that neither the federal nor the Illinois constitution required a jury trial in proceedings under the Act. *In re Presley*, 47 Ill. 2d 50, 55 (1970); *In re Jones*, 46 Ill. 2d 506, 508 (1970).

¶ 85     Moreover, shortly after *Fucini* was decided, the United States Supreme Court addressed whether the due process clause of the fourteenth amendment required a jury trial in the adjudicative phase of a state juvenile court delinquency proceeding. *McKeiver v. Pennsylvania*, 403 U.S. 528 (1971) (plurality op.). *McKeiver* was a plurality opinion, although six of the justices agreed that the sixth amendment did not require a jury trial. *McKeiver* noted that "the juvenile court proceeding has not yet been held to be a 'criminal prosecution,' within the meaning and reach of the Sixth Amendment" but also had not "yet been regarded as devoid of criminal aspects merely because it usually has been given the civil label." *Id.* at 541. The Court also conceded that "the fond and idealistic hopes of the juvenile court proponents and early reformers of three generations ago have not been realized." *Id.* at 543-44. The Court held, however, that despite the disappointments, failures and shortcomings of the juvenile court system, "trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement." *Id.* at 545.

¶ 86     Jonathon argues that the enactment of the Juvenile Justice Reform Provisions of 1998, which became effective on January 1, 1999, compel the conclusion that, in Illinois, juveniles

-18-

are subject to criminal prosecution. In support, Jonathon notes that this court has used the term "prosecution" when discussing the proceedings brought against a juvenile under the Act, citing *People ex rel. Devine v. Stralka*, 226 Ill. 2d 445 (2007). Moreover, the amendments to the Act changed the terminology used concerning delinquency proceedings, so that juvenile proceedings are called "trials" (705 ILCS 405/5-105(17) (West 2006)), that result in "findings of guilt" (705 ILCS 405/5-620 (West 2006)), leading to a "sentencing hearing" (705 ILCS 405/5-105(13) (West 2006)). Given the change in terminology, Jonathon contends that juveniles are subject to criminal prosecutions which result in convictions and sentences of incarceration; therefore, they are entitled to jury trials under article I, section 8, of the Illinois Constitution.

¶ 87    The argument that the change in terminology following the 1999 amendments renders the Act akin to the criminal justice system has been considered and rejected. In *People v. Taylor*, the court recognized that the 1999 amendments changed some of the terminology of the Act, so that the Act now provides for a number of features common to a criminal trial. *People v. Taylor*, 221 Ill. 2d 157, 167 (2006). Nonetheless, the court recognized that:

> "The policy that seeks to hold juveniles accountable for their actions and to protect the public does not negate the concept that rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system and that there are still significant differences between the two, indicating that 'the ideal of separate treatment of children is still worth pursuing.' " *Id.* at 170 (quoting *McKeiver*, 403 U.S. at 546 n.6 (plurality op.)).

¶ 88    Jonathon then observes that every minor adjudicated guilty for the commission of any felony offense must provide a DNA sample to the Illinois Department of State Police, just like an adult felon, pursuant to section 5-4-3(a)(3.5) of the Unified Code of Corrections (730 ILCS 5/5-4-3(a)(3.5) (West 2006)). Further, confidentiality rules pertaining to juveniles have been amended to permit the general public access to the personal information of juveniles adjudicated guilty of first degree murder, attempted first degree murder, aggravated criminal sexual assault, or criminal sexual assault. 705 ILCS 405/5-901(5)(a) (West 2006). Juveniles adjudicated guilty of a criminal sexual offense also are required to register under the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2006)). Jonathon argues that, in light of these consequences, juvenile adjudications now have essentially been equated with felony convictions.

¶ 89    As argued by the State, however, the fact that in a narrow set of delineated circumstances delinquent minors face some of the same collateral consequences as convicted adult criminals does not equate a delinquency adjudication with a criminal conviction. As the court recognized in *In re J.W.*, 204 Ill. 2d 50, 75 (2003), requiring a juvenile sex offender to register, and allowing very limited public access to notification concerning the juvenile's status as a sex offender, does not constitute punishment. Further, with regard to confidentiality, "while it is undoubtedly true that a delinquency adjudication is still not the legal equivalent of a felony conviction despite the amendments to the Act, it does not follow inexorably that a juvenile adjudicated delinquent for committing a felony offense does not have a diminished expectation of privacy." *Lakisha M.*, 227 Ill. 2d at 270-71. Addressing DNA evidence, *Lakisha M.* expressly recognized that "maintaining a delinquent juvenile's

genetic analysis information in state and national data banks for law enforcement purposes advances, rather than conflicts with, the goals of our Juvenile Court Act." *Id.* at 274.

¶ 90 Jonathon additionally argues that this court's decisions have emphasized the adversarial nature of the Act, and the overriding interest of the legislature in protecting the public. Jonathon asserts that punishment and public safety are now the purpose and policy of the Act. Jonathon further notes that in *In re G.O.*, 191 Ill. 2d 37 (2000), Justice Heiple, in dissent, maintained that the minor had a right to a jury trial under article I, section 8, of the Illinois Constitution of 1970, because most attributes of the adult criminal justice system were already permanent features of the juvenile justice system.

¶ 91 Since the amendments to the Act were enacted in 1999, this court has considered the impact of those amendments in various contexts. Nonetheless, this court has declined to adopt the position set forth in Justice Heiple's dissent in *In re G.O.* This court also has consistently rejected the argument that the amendments rendered the Act punitive and equivalent to a criminal prosecution.

¶ 92 For example, in *In re A.G.*, 195 Ill. 2d 313, 317 (2001), this court noted that:

> "the Juvenile Court Act has been significantly amended since this court's decision in *In re Beasley*. *Although proceedings under the Act are still not criminal in nature and are to be administered in a spirit of humane concern for, and to promote the welfare of, the minor* [citation], article V of the Act has been reconfigured and now contains a purpose and policy section which represents a fundamental shift from the singular goal of rehabilitation *to include* the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law." (Emphases added.)

¶ 93 This court reaffirmed *In re A.G.*'s characterization of the amendments to the Act in *People v. Taylor*, referencing the preceding text. *Taylor*, 221 Ill. 2d at 166-67. *Taylor* further explained that:

> "The policy that seeks to hold juveniles accountable for their actions and to protect the public *does not negate the concept that rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system and that there are still significant differences between the two* ***." (Emphasis added.) *Id.* at 170.

¶ 94 In *In re Rodney H.*, 223 Ill. 2d 510, 520 (2006), this court again stated that, "[e]ven as the legislature recognized that the juvenile court system should protect the public, it tempered that goal with the goal of developing delinquent minors into productive adults, and gave the trial court options designed to reach both goals." The *Rodney H.* court also stated that proceedings under the Act are still not criminal in nature, holding that:

> " 'Delinquency proceedings are *** protective in nature and the purpose of the Act is to correct and rehabilitate, not to punish.' *In re W.C.*, 167 Ill. 2d 307, 320 (1995); see also *In re Beasley*, 66 Ill. 2d 385, 390 (1977), citing *McKeiver v. Pennsylvania*, 403 U.S. 528, 541, 29 L. Ed. 2d 647, 658, 91 S. Ct. 1976, 1984 (1971) ***." *Id.*

¶ 95 Recently, this court again reiterated that "it is undoubtedly true that a delinquency adjudication is still not the legal equivalent of a felony conviction despite the amendments

to the Act." *In re Lakisha M.*, 227 Ill. 2d at 270. Thereafter, this court rejected a minor's claim that the right to a jury trial is fundamental. *Konetski*, 233 Ill. 2d at 204 ("The Supreme Court's decision in *McKeiver* refutes the minor's claim" that the right to a jury trial is fundamental). *Konetski* also noted that "[t]he Supreme Court has held the due process clause does not require the right to a jury trial in juvenile delinquency proceedings," citing *McKeiver*. *Id.* at 202.

¶ 96 Moreover, as the State points out, even prior to the 1999 amendments, the Act provided juveniles with many of the criminal protections that they now have. Juveniles had the right to counsel, the right to confront witnesses, to cross-examine, to remain silent, and to adequate notice. *In re W.C.*, 167 Ill. 2d at 320-21. The Act specifically provided that the procedural rights of minors shall be the rights of adults unless specifically precluded by laws enhancing the juvenile's protection. *Id.* at 321. Further, the standard of proof and rules of evidence applicable at the adjudicatory hearing were the same as those in the nature of criminal proceedings. *Id.* Nonetheless, the court held that the application of the safeguards and standards of a criminal proceeding did not transform delinquency proceedings into criminal proceedings or indicate that a fully adversarial process was developed. *Id.*

¶ 97 In sum, this court has consistently and repeatedly rejected the argument that the 1999 amendments to the Act render delinquency adjudications the equivalent of felony convictions, so that juveniles have a constitutional right to a jury trial under the Act. Jonathon has failed to advance any new or compelling arguments supporting his claim that he was entitled to a jury trial pursuant to article I, section 8, of the Illinois Constitution. We therefore reject Jonathon's claim that section 5-101(3) of the Act is unconstitutional under article I, section 8, of the Illinois Constitution.

¶ 98 Jonathon next argues that section 5-101(3) of the Act is unconstitutional as applied to juveniles adjudicated delinquent for criminal sexual assault and other felony sex offenses under the due process and equal protection clauses of the Illinois and United States Constitutions.

¶ 99 With regard to his due process claim, Jonathon again acknowledges that the Illinois and United States supreme courts have rejected due process challenges to the lack of jury trials in delinquency proceedings. Jonathon again argues, however, that those cases predated subsequent amendments to the Act which radically altered the treatment of juveniles charged with felony sex offenses. Jonathon maintains that the shift in purpose, along with the more severe consequences imposed on minors adjudicated delinquent for felony sex offenses, entitles those minors to jury trials.

¶ 100 Jonathon contends that juveniles charged with felony sex offenses "face a unique constellation of consequences based on a legislative determination that such minors pose serious concerns which justify treating them differently than other delinquent minors." For example, juveniles charged with criminal sexual assault do not have the benefit of the confidentiality of their court records, nor do they have the benefit of the expungement provisions of the Act.

¶ 101 First, as the State points out, juveniles adjudicated delinquent for felony sex offenses do not face more serious consequences than other juvenile offenders. Juveniles charged with

felony sex offenses face the same sentence as most juveniles, which is an indeterminate sentence that automatically terminates when the juvenile reaches 21 years of age. See 705 ILCS 405/5-750(3) (West 2006).

¶ 102 Second, the collateral consequences faced by juveniles charged with felony sex offenses, lessened confidentiality and no expungement, are not severe consequences entitling those juveniles to a jury trial. As discussed, even though a juvenile adjudication is not the legal equivalent of a felony, a juvenile adjudicated delinquent for committing a felony offense nonetheless has a diminished expectation of privacy. *Lakisha M.*, 227 Ill. 2d at 270-71. Thus, "[w]hen a minor, *** is found guilty of committing a felony offense and is made a ward of the court [citation] her identity is a matter of state interest and, as a result, she can no longer have the same expectation of privacy enjoyed by ordinary, law-abiding citizens." *Id.* at 271.

¶ 103 In the context of DNA collection and storage, *Lakisha M.* held that the procedure "has a deterrent and rehabilitative effect that actually advances the goals of the *** Act." *Id.* at 278. The court observed that DNA sampling "has a deterrent and rehabilitating effect because it identifies those at risk of reoffending," and, thus, is consistent with the Act's purpose of rehabilitating juveniles to prevent further delinquent behavior. *Id.* at 274.

¶ 104 Here too, the reduced confidentiality of court records and the prohibition on expungement for juveniles charged with felony sex offenses would have the deterrent and rehabilitating effect of identifying those at risk of reoffending, consistent with the rehabilitative purposes of the Act to prevent further delinquent behavior. Contrary to Jonathon's argument, the imposition of collateral consequences on juveniles adjudicated delinquent for committing felony sex offenses does not negate the rehabilitative purposes of the Act for those juveniles.

¶ 105 Jonathon further claims that juveniles charged with committing sex offenses should be entitled to a jury trial because the decision in *In re J.W.*, 204 Ill. 2d 50 (2003), confirmed that the protection of society is now the purpose of the Act, in holding that a juvenile was required to register as a sex offender under SORA for life. Jonathon acknowledges that the *Konetski* decision rejected a minor's claim that SORA violated due process because it was punishment imposed on the basis of an adjudication without the benefit of a jury trial. Jonathon clarifies that he is not arguing that SORA is unconstitutional or that it is punishment, but rather is arguing that "juvenile sex offenders are entitled to a jury trial because of the current climate of adversarial proceedings that have been imported to the *** Act, including registration as a sex offender (admittedly a collateral consequence)."

¶ 106 Although Jonathon denies that *Konetski* is dispositive of this argument, *Konetski* is directly on point. *Konetski* reiterated that it has been repeatedly held that SORA's requirements do not constitute punishment. *Konetski*, 233 Ill. 2d at 203. Rather, SORA was a regulatory statute intended to foster public safety. *Id.* Moreover, amendments to SORA significantly reduced the impact of the minor's registration requirements. *Id.* Thus, minors are not required to register as adults when they reach 17 years of age, meaning that their registration information is available only to a limited group, and minors may petition for termination of their registration after five years, a procedure not available to adults. *Id.* Given these differences for minors, the court held that a minor's registration obligation was not

sufficiently burdensome to mandate the additional procedural protection of a jury trial. *Id.*

¶ 107    Jonathon further points out that in *Konetski*, this court cited *McKeiver* in noting that the due process clause does not require the right to a jury trial in a juvenile delinquency proceeding. *Konetski*, 233 Ill. 2d at 202. Jonathon argues that it is erroneous to currently cite *McKeiver*, as the purpose and policy of the Act have changed so drastically that it bears little resemblance to the Act in existence when *McKeiver* was decided. Jonathon also notes that the Supreme Court of Kansas recently held that juveniles have a right to a jury trial because of changes to its juvenile court act, citing *In re L.M.*, 186 P.3d 164 (Kan. 2008). The *L.M.* court held that the changes to its juvenile court act superceded *McKeiver*, because the juvenile justice system was now patterned after the adult criminal system.

¶ 108    As discussed, *supra*, this court has repeatedly rejected claims that the purpose and policy of the Act have changed so drastically following the 1999 amendments that we will depart from the precedent from our court or the United States Supreme Court in *McKeiver*. While recognizing that the amendments to the Act included concerns of protecting the public and holding juvenile offenders accountable for violations of the law, this court has repeatedly reaffirmed that "rehabilitation of the minor remains one of the chief goals of the Act." *People ex rel. Devine v. Stralka*, 226 Ill. 2d at 457.

¶ 109    To adopt Jonathon's position would require this court to stray from principles of *stare decisis*. The doctrine of *stare decisis* expresses the policy of the courts to stand by precedents and not to disturb settled points. *People v. Williams*, 235 Ill. 2d 286, 294 (2009). When a question has been deliberately examined and decided, that question should be considered settled and closed to further argument. *Id.* Any departure from *stare decisis* must be specially justified and prior decisions should not be overruled absent good cause or compelling reasons. *Id.* (quoting *People v. Colon*, 225 Ill. 2d 125, 146 (2007)). Jonathon has failed to provide this court with good cause or compelling reasons to depart from our prior decisions.

¶ 110    Nor are we persuaded to abandon our precedent based upon the Kansas Supreme Court's decision in *L.M.* The *L.M.* decision is inapposite. The decision of the *L.M.* court was based upon its interpretation of the revised Kansas Juvenile Justice Code, which differs significantly from the Act.

¶ 111    Jonathon, then, has failed to establish that the Act violates the due process clause of the Illinois Constitution of 1970 or the United States Constitution as applied to juveniles charged with felony sex offenses.

¶ 112    Finally, Jonathon argues that the Act's prohibition on jury trials in delinquency proceedings unless expressly authorized by the Act violates the equal protection clause of the fourteenth amendment to the United States Constitution and article I, section 2, of the Illinois Constitution. Jonathon contends there is no rational basis for giving juveniles adjudicated delinquent of sex offenses less protection than either similarly situated juveniles subject to extended juvenile jurisdiction (EJJ) proceedings, or adult sex offenders, both of whom are accorded the right to a jury trial. Jonathon states that the rational basis test is the appropriate standard for evaluating equal protection challenges to the lack of jury trials in delinquency proceedings.

¶ 113    Jonathon maintains there is no rational basis for granting jury trials to minors subject to

EJJ prosecutions, but not to minors charged with felony sex offenses. Jonathon claims that both classes of minors face potential deprivations of liberty beyond their normal juvenile sentence, based on their initial adjudications of delinquency. Jonathon notes that minors who are subject to EJJ prosecutions receive both an adult and a juvenile sentence if they are adjudicated delinquent. The adult sentence is vacated if the minor successfully completes the juvenile sentence, but the minor must serve the adult sentence if the State proves that the minor violated a term of his juvenile sentence or committed a new criminal offense. Therefore, the EJJ minor's original adjudication of delinquency serves as the predicate for a potential, but not certain, future deprivation of liberty.

¶ 114    Jonathon argues that juveniles adjudicated delinquent for felony sex offenses also are subject to potential, but not certain, future losses of liberty in the form of involuntary commitment under the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.* (West 2006)), based upon their original adjudication of delinquency. Accordingly, Jonathon contends that minors adjudicated delinquent for felony sex offenses are similarly situated to minors who are subject to EJJ proceedings for purposes of equal protection.

¶ 115    Jonathon further contends that his potential loss of liberty under the SVP Act renders him similarly situated to adult sex offenders, who face the same potential consequences under the SVP Act. Jonathon argues that there is no rational basis for denying him a jury trial when similarly situated adults have such a right.

¶ 116    In conducting an equal protection analysis, this court applies the same standards under the United States Constitution and the Illinois Constitution. *Wauconda Fire Protection District v. Stonewall Orchards, LLP*, 214 Ill. 2d 417, 434 (2005). The equal protection clause guarantees that similarly situated individuals will be treated in a similar fashion, unless the government can demonstrate an appropriate reason to treat them differently. *People v. Whitfield*, 228 Ill. 2d 502, 512 (2007). The equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people, but it does prohibit the government from doing so on the basis of criteria wholly unrelated to the legislation's purpose. *Wauconda Fire Protection District*, 214 Ill. 2d at 434. Where fundamental rights are not at issue, this court applies a rational basis scrutiny and considers whether the challenged classification bears a rational relationship to a legitimate governmental purpose. *Whitfield*, 228 Ill. 2d at 512.

¶ 117    As the State argues, Jonathon has failed to meet the threshold requirement for an equal protection claim, as Jonathon cannot establish that he is similarly situated to juveniles subject to EJJ prosecutions or to adult sex offenders. In *Konetski*, the court noted that the legislature had granted juvenile offenders the right to a jury trial in EJJ prosecutions, habitual juvenile offender prosecutions, and violent offender proceedings. *Konetski*, 233 Ill. 2d at 204-05. *Konetski* noted that those proceedings involved severe deprivations of liberty: mandatory incarceration or the possibility of an adult sentence. *Id.* at 205. Likewise, adult sex offenders are subject to an adult sentence if found guilty.

¶ 118    In contrast, Jonathon never faced the possibility of an adult criminal sentence, and instead received a sentence that automatically terminated in five years, when he reached age 21, with

no mandatory supervised release term. The plain language of the Act sets the age of 21 as the maximum for all juvenile dispositions, with the limited exception of juveniles subject to the EJJ proceedings. *In re Jamie P.*, 223 Ill. 2d 526, 539 (2006). Jonathon, therefore, was not subject to the severe deprivation of liberty of an adult sentence and, thus, was not similarly situated to minors subject to EJJ prosecution or adult sex offenders.

¶ 119 Moreover, the fact that juvenile sex offenders might face the possibility of a future loss of liberty in the form of an involuntary commitment under the SVP Act does not mean that Jonathon is similarly situated to juveniles subject to EJJ proceedings or adult sex offenders. The appellate court correctly rejected this argument, holding that commitment under the SVP Act could only result after a successful, separate action by the State, an action requiring proof of additional elements not common to all sex offenders, whether juvenile or adult. 386 Ill. App. 3d at 751. As the State observes, all persons subject to the SVP Act are treated alike, with each person having a right to a jury trial to determine whether he is a sexually violent person. See 725 ILCS 207/35(c) (West 2006).

¶ 120 Because Jonathon is not similarly situated to juveniles subject to EJJ prosecutions or adults facing felony sex offense charges, we need not consider whether there is a rational basis for granting jury trials to minors subject to EJJ prosecutions and adults charged with felony sex offenses, but not to minors charged with felony sex offenses. Jonathon has failed to establish that the Act violates the equal protection guarantees of the Illinois and United States Constitutions.

¶ 121                                    CONCLUSION

¶ 122 For all of the foregoing reasons, we affirm the decision of the appellate court.


¶ 123 Appellate court judgment affirmed.


¶ 124 CHIEF JUSTICE KILBRIDE, dissenting:

¶ 125 I agree with Justice Freeman that the trial court's error in failing to conduct a *Boose* hearing to determine the manifest need to shackle Jonathon should be reviewed under the second prong of the plain-error doctrine, the fundamental fairness prong. Because the error denied Jonathon a fair trial, he is entitled to a new bench hearing. Thus, in accordance with my position in *People v. Allen*, 222 Ill. 2d 340, 361 (2006) (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.), I dissent from the majority's decision.


¶ 126 JUSTICE FREEMAN, dissenting:

¶ 127 I dissent. The trial court committed error by failing to ascertain whether Jonathon was shackled in her courtroom and, if so, whether the physical restraints were manifestly necessary pursuant to *People v. Boose*, 66 Ill. 2d 261 (1977), and *In re Staley*, 67 Ill. 2d 33 (1977). Jonathon procedurally forfeited appellate review of this error. Based on the second prong of the plain-error doctrine, the *Boose* error entitles Jonathon to a new juvenile proceeding. However, the new proceeding should be a bench hearing in accordance with

established law.

¶ 128                           I. Error Occurred

¶ 129    Jonathon's trial spanned six court days. At the beginning of each session, for the record, the trial court announced, *inter alia*, the name of the case, the circuit court docket number, and that Jonathon appeared personally and by counsel. On August 18, 2006, the court held a status hearing and set a trial date. On August 30, Jonathon's trial began and was continued to September 25. Near the end of this third court day, the following colloquy occurred:

"[Defense counsel]: Call the Respondent, Your Honor.

THE COURT: Okay. You may step up.

You may take off the shackles.

Sir, you may go ahead and approach the bench.

Raise your right hand."

Jonathon testified. Only one additional witness briefly testified after him. On September 27, Jonathon was found guilty, on October 26, the matter was continued, and on November 13, Jonathon was sentenced.

¶ 130                          A. *Boose/Staley*

¶ 131    In *Boose*, this court held that a defendant should not be subjected to physical restraint while in court unless the trial judge has found such restraint manifestly necessary. A defendant may be shackled when there is reason to believe that the defendant may try to escape, or that the defendant may pose a threat to the safety of people in the courtroom, or if necessary to maintain order during trial. This determination is left to the discretion of the trial court, which may select the particular restraint most suitable in light of all the circumstances. The trial court should state for the record the reasons for allowing the defendant to remain shackled after being brought into the courtroom. *Boose*, 66 Ill. 2d at 266. In *Staley*, this court held: "In the absence of such a showing, however, which must be established clearly on the record [citing *Boose*], an accused cannot be tried in shackles whether there is to be a bench trial or a trial by jury." *Staley*, 67 Ill. 2d at 38.

¶ 132                     B. Jonathon's Juvenile Proceeding

¶ 133    In the present case, Jonathon concedes that neither he nor his trial counsel objected to the shackles, or requested a *Boose* hearing to determine whether the shackles were manifestly necessary. Before this court, the State does *not* respond that no error occurred at all. Rather, the State concedes that error occurred, but contends that Jonathon forfeited the error by failing to object, and that the conceded error did not amount to plain error. Thus, Jonathon and the State squarely request this court to apply the plain-error rule to this conceded trial court error.

¶ 134    However, instead of adjudicating the issue presented, the court concludes that "there is no affirmative indication in the record that the trial court was aware of the shackles before

Jonathon was called to testify, so we presume that the trial court acted properly and did not commit error with regard to Jonathon's shackling." *Supra* ¶ 72. For this reason, the court determines that it "need not reach [Jonathon's plain-error argument]." *Supra* ¶ 74.

¶ 135    I cannot accept this maneuver to avoid a proper plain-error analysis. It strains credulity that the trial judge did not learn that Jonathon was shackled in her courtroom until the third court day of the proceeding. Rather, the more realistic inference from the record is that the trial court was aware of Jonathon's shackles during the juvenile proceeding because the trial court directed that Jonathon's shackles be removed when he testified.

¶ 136    My colleagues in the majority state that I am guilty of speculating as to my view of the record. If I am speculating, so are they. The court presumes that the trial judge knew and followed the law concerning shackling absent affirmative evidence to the contrary. *Supra* ¶ 76. However, the law clearly required more from the judge than what the record indicates. This court has recognized the axiomatic principle that the trial court " 'must rigorously control its own courtroom procedures and, consistent with the mandates of due process, protect the rights of the parties and the public.' " *People v. Allen*, 222 Ill. 2d 340, 349 (2006) (quoting *People v. Martinez*, 347 Ill. App. 3d 1001, 1004 (2004)); accord *State v. Stewart*, 392 A.2d 234, 239 (N.J. Super. Ct. App. Div. 1978) (it is essential to administration of justice that trial judge be "acutely responsive" to task of supervising and controlling trial); *People v. Kamischke*, 142 N.W.2d 21, 24 (Mich. App. 1966) (trial courts are obliged to guard and enforce personal rights secured by state and federal constitutions).

¶ 137    My colleagues in the majority wish to have it both ways. They have acknowledged these responsibilities of a trial judge, but refuse to hold this trial judge accountable for abdicating her responsibilities in this case. Therefore, I agree with Justice Burke that if this court presumes anything, "we should presume that the trial judge was aware of the security measures being used in her own courtroom." *Infra* ¶ 169 (Burke, J., dissenting).

¶ 138    Today's analysis is problematic for other reasons as well. The court states that since the trial judge did not expressly order that Jonathon wear the shackles and, further, did not even know that he was wearing them, then the trial judge cannot be charged with responsibility for them. Further, if the trial judge did nothing wrong, then there is no court action that needs to be justified and no need for a *Boose* hearing. However, once the trial judge did become aware of the shackles, and became charged with responsibility for them, the judge ordered that they be removed. Thus, there was no error either at the start of the proceeding or when the trial court became aware of the shackles. *Supra* ¶ 71.

¶ 139    The clear implication of this reasoning is that the trial judge had no affirmative obligation to ascertain whether Jonathon was shackled when he was brought into the courtroom during the course of his juvenile proceeding. Rather, the trial judge could passively decline to exercise her discretion on the record, and defer the subject of courtroom security to the county sheriff. I disagree with this reasoning and its result in this case for several reasons.

¶ 140    As an initial matter, the record shows that the trial court did not heed our "message" in *Allen*, rendered only a few months prior to Jonathon's trial:

          "This opinion sends a clear message to the trial courts: control of the courtroom is
          vested in the trial judge. While the sheriff may be responsible for courtroom security,

-27-

it is the trial judge who makes the determination as to how security involving a defendant who is on trial is handled, so as to fully protect his constitutional rights." *Allen*, 222 Ill. 2d at 355-56.

In *Allen*, this court took judicial notice of the *routine* use of stun belts on felons in Will County. *Id.* at 356; *id.* at 379 n.6 (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.). Although this court condemned blanket or standard policies of sheriffs' offices to physically restrain *all* defendants during court proceedings, this case demonstrates how pervasive the practice has become throughout the state. As the dissenting justice in the appellate court surmised, defense counsel currently assume that an objection to a juvenile's shackling "would be futile because routine shackling is the *modus operandi*." 386 Ill. App. 3d at 753 (Appleton, P.J., dissenting). This court's continued tolerance of the intolerable will only embolden the continued disregard of the necessity of the *Boose* hearing.

¶ 141    Nonetheless it remains the law, if not the practice, that " '[a] trial court abuses its discretion if it abdicates this decision-making authority to security personnel or law enforcement.' " *People v. Mar*, 52 P.3d 95, 105-06 (Cal. 2002) (quoting *People v. Hill*, 952 P.2d 673, 696 (Cal. 1998)); *State v. Flieger*, 955 P.2d 872, 874 (Wash. App. 1998) (same). "While courtroom security is an increasingly pressing concern, routinely restraining defendants is not a permissible manner in which to address it." *Davis v. Texas*, 195 S.W.3d 311, 316 (Tex. App. 2006).

¶ 142    Further, the court, without expressly saying so and without citation to authority, appears today to be saying that no error occurred because defendant did not object. In *People v. Hyche*, 77 Ill. 2d 229 (1979), the court said that when a defendant does not object to the use of handcuffs, that failure " 'is sufficient to negate the presence of compulsion necessary to establish a constitutional violation.' " *Id*. at 241 (quoting *Estelle v. Williams*, 425 U.S. 501, 512-13 (1976)).

¶ 143    However, in *Allen*, this court retreated from *Hyche* without noting that it was doing so. In *Allen*, the court expressly observed that the defendant had failed to object to the use of a stun belt. *Allen*, 222 Ill. 2d at 350. Yet the court also held that the trial court erred in not providing proper justification for the restraint. *Id.* at 348. Thus, under *Allen*, when the trial court is aware of the physical restraint, the court is charged with the responsibility for it and we can say that the court has compelled the defendant to wear it, even if there is no objection by the defendant. See 386 Ill. App. 3d at 753 (Appleton, P.J., dissenting) ("the supreme court apparently no longer subscribes to the rather facile no-objection, no-compulsion rationale of *Hyche*"). Therefore, based on *Allen*, the failure to object to unnecessary shackles does not mean that the error did not occur.

¶ 144    Further, I am not convinced that it should be the responsibility of a juvenile in a delinquency proceeding to ensure that he or she is provided a trial free from inherently prejudicial practices. That duty should belong to the State and to the trial court. Ironically, as noted in today's opinion, the current purpose of the juvenile justice system is not only to protect the public, but also to develop "delinquent minors into productive adults." *In re Rodney H.*, 223 Ill. 2d 510, 520 (2006). A purpose of the current Juvenile Court Act is to correct and rehabilitate, not to punish. Therefore, delinquency proceedings are protective in

nature. *Id*. (collecting cases). In delinquency proceedings, "[t]he relationship between the minor and the court is open and in the nature of *parens patriae*." *In re W.C.*, 167 Ill. 2d 307, 325-26 (1995). For example, our appellate court has held that the Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 2010)), a collateral remedy for most adult offenders, does not apply to juveniles. See *In re A.W.H.*, 95 Ill. App. 3d 1106, 1107 (1981); *In re Thomas*, 77 Ill. App. 3d 299, 300 (1979). Accordingly: "It is the public policy of this State that a court guards carefully the rights of minors, and, to this end, a court will even intervene of its own motion and take note of legitimate and substantial errors in proceedings [involving] minors even though the minors were represented by counsel." *In re Carson*, 10 Ill. App. 3d 387, 388-89 (1973).

¶ 145     It should be beyond debate that "shackling is 'inherently prejudicial.' " *Deck v. Missouri*, 544 U.S. 622, 635 (2005) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986)). "The rule that a prisoner brought into court for trial is entitled to appear free from all bonds or shackles is an important component of a fair and impartial trial." *Kennedy v. Cardwell*, 487 F.2d 101, 105 (6th Cir. 1973) (citing *Woodards v. Cardwell*, 430 F.2d 978, 982 (6th Cir. 1970)). Courts have repeatedly explained the three due process concerns with subjecting defendants to unnecessary physical restraints such as shackles. First, unnecessary shackling "tends to prejudice the jury against the accused." *Boose*, 66 Ill. 2d at 265; accord *Deck v. Missouri*, 544 U.S. 622, 630 (2005). "[E]ven when there is no jury, any unnecessary restraint is impermissible because it *** runs afoul of the presumption of innocence ***." *Allen*, 222 Ill. 2d at 346. Requiring an accused to appear in a courtroom in unnecessary physical restraints while he or she is being judged jeopardizes the value and protection of the presumption of innocence. *Staley*, 67 Ill. 2d at 37.

¶ 146     Second, unnecessary physical restraint is impermissible because it can confuse, distract, and embarrass a defendant (*Deck*, 544 U.S. at 631), thereby restricting the ability of an accused to cooperate with defense counsel and otherwise assist in his or her defense. *Staley*, 67 Ill. 2d at 37.

¶ 147     Third, unnecessary physical restraint is impermissible because it "offends the dignity of the judicial process." *Boose*, 66 Ill. 2d at 265. The United States Supreme Court has explained as follows:

> "The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve. The routine use of shackles in the presence of juries would undermine these symbolic yet concrete objectives." *Deck*, 544 U.S. at 631.

Even in a bench trial, unnecessary physical restraint "demeans our justice." *Staley*, 67 Ill. 2d at 37.

¶ 148     Unnecessary physical restraints in a bench trial not only offend the dignity of the judicial process, but they also jade the defendant's perception of the trial judge's impartiality. Again

as Presiding Justice Appleton explained in the appellate court dissent:

> "[U]nnecessary shackling threatens the dignity of the court. [Citation.] As a court loses its dignity, it loses credibility with the public [citation]; and I further would argue that it loses credibility with the respondent–to the possible detriment of his defense. To do his best at trial, the defendant must have confidence that he is making his case to a rational and impartial trier of fact who genuinely presumes he is innocent until the State proves him to be guilty beyond a reasonable doubt. Unnecessary and unjustified shackling weakens that confidence; it jeopardizes the presumption's value and protection. [Citation.] The presumption of innocence is a noble ideal, but this ideal will inspire little hope if hard iron reminds the defendant, every moment of the trial, how things really are between him and the court–for, plainly, he is not stand[ing] trial with the appearance, dignity, and self-respect of a free and innocent man. [Citation.] In addition to defending himself against the State's evidence, a defendant should not have to struggle with a sense of futility, a disheartening suspicion that he is presumed guilty. Anyone who can sit in chains with no diminution of courage and confidence has a thicker hide than the common run of humanity." (Internal quotation marks omitted.) 386 Ill. App. 3d at 757-58 (Appleton, P.J., dissenting).

This court requires that trial judges recognize and abide by the presumption of innocence guaranteed by the constitution. However, trial judges are only human, and from the perspective of an unnecessarily shackled defendant, guilt is presumed and trial is merely a formality.

¶ 149 These constitutional concerns are enhanced in the context of a juvenile delinquency proceeding. Scholars recognize that unnecessarily shackling children causes not only physical harm from restraints designed for adults, but also psychological harm. The routine and indiscriminate imposition of shackles on children may exacerbate feelings of isolation, hopelessness, and insecurity (Anita Nabha, *Shuffling to Justice: Why Children Should Not Be Shackled in Court*, 73 Brook. L. Rev. 1549, 1575-80 (2008)), and causes needless humiliation and trauma (Brian D. Gallagher & John C. Lore III, *Shackling Children in Juvenile Court: The Growing Debate, Recent Trends and the Way to Protect Everyone's Interest*, 12 U.C. Davis J. Juv. L. & Pol'y 453, 460-62 (2008)). These enhanced psychological harms significantly burden shackled children in exercising their constitutional right to the assistance of counsel. Bernard P. Perlmutter, *"Unchain the Children": Gault, Therapeutic Jurisprudence, and Shackling*, 9 Barry L. Rev. 1, 37 (2007). Therefore, a child's right to remain unshackled during a juvenile proceeding accords with the rehabilitative purposes of juvenile justice. "Allowing a young person who poses no security hazard to appear before the court unshackled, with the dignity of a free and innocent person, may foster respect for the judicial process." *In re Millican*, 906 P.2d 857, 860 (Or. App. 1995).

¶ 150 It appears that those in the majority again wish to have it both ways regarding juvenile proceedings. They rely on the unique nature of juvenile proceedings to deny a general right to a jury (*supra* ¶¶ 78-97), but in the same breath disregard that unique nature to allow children to be routinely shackled during juvenile proceedings without a *Boose* hearing. The court discusses at length our case law pertaining to juvenile proceedings. Indeed, *it*

-30-

emphasizes that proceedings under the Juvenile Court Act " '*are to be administered in a spirit of humane concern for, and to promote the welfare of, the minor \*\*\*.*' (Emphasis added.)" *Supra* ¶ 92 (quoting *In re A.G.*, 195 Ill. 2d 313, 317 (2001)). It repeats the maxim that delinquency proceedings are protective in nature, and that the purpose of the Act is to correct and rehabilitate, rather than to punish, juveniles. *Supra* ¶ 94. My colleagues again recognize that there still exist significant differences between the juvenile justice system and the criminal justice system, which indicate that the goal of treating children separately is still worth pursuing. *Supra* ¶ 87. If juvenile delinquency proceedings are so different from the criminal justice system as to justify denial of a jury, then juvenile proceedings are sufficiently unique to require a trial judge to ascertain whether a juvenile is physically restrained in the courtroom. My colleagues cannot have it both ways.[1]

¶ 151    For all of these reasons, I would hold that a juvenile respondent has the right to appear in a courtroom free of unnecessary physical restraints unless justification is established. *Staley*, 67 Ill. 2d at 38. Further, the trial court has the duty, in the nature of *parens patriae*, to ascertain whether a juvenile is physically restrained in the courtroom. If the juvenile is to remain shackled after being conducted into a courtroom, a *Boose* hearing, upon motion, is required because physical restraints implicate the above-described due process concerns and, therefore, require that strict limits be placed on their use. See *Allen*, 222 Ill. 2d at 356; *Tiffany A. v. Superior Court*, 59 Cal. Rptr. 3d 363, 373 (Cal. Ct. App. 2007) (concluding that "any decision to shackle a minor who appears in [juvenile court] for a court proceeding must be based on the non-conforming conduct and behavior of that individual minor. Moreover, the decision to shackle a minor must be made on a case-by-case basis.").

¶ 152                                    C. Consequences

¶ 153    Further, the court's avoidance of this plain-error issue is detrimental to a sound body of law and creates confusion for the bench and bar. By failing to adhere to settled law in determining when *Boose* error amounts to plain error, this court once again "call[s] into question the proper analytical sequence used to review" a particular assertion of error. *People v. Sanders*, 238 Ill. 2d 391, 414 (2010) (Freeman, J., specially concurring, joined by Burke, J.) (discussing proper postconviction analysis).

¶ 154    This court's recent and unanimous decision in *People v. Urdiales*, 225 Ill. 2d 354 (2007), is instructive. The defendant was shackled during his criminal trial. On appeal, the defendant contended that his shackling deprived him of due process and fundamental fairness. In response, the State contended that defendant procedurally forfeited the issue for review, and alternatively contended that no error occurred. Addressing " 'whether error occurred at all' " (*id.* at 415 (quoting *People v. Wade*, 131 Ill. 2d 370, 376 (1989))), this court noted, *inter alia*, that "the trial court made findings sufficient to justify the use of physical restraints" (*id.*).

---

[1]Indeed, based on its analysis, I *agree* with today's conclusion that Jonathon's new trial should be a bench trial. However, my colleagues' inconsistent treatment of the *parens patriae* role of the trial court in these corrective and rehabilitative proceedings leads to the criticism that juveniles deserve the protections that a jury trial affords. See *infra* ¶¶ 179-217 (Burke, J., dissenting).

¶ 155    In the present case, this court should be guided by *Urdiales*. Initially, in *Urdiales*, the State actually contended that no error occurred at all. Here, this court *sua sponte* jumps onto this wagon. Also, in *Urdiales*, we correctly recognized that *the defendant was actually shackled*. Although the trial court did not hold a *Boose* hearing, we concluded that no error occurred because the trial court made findings indicating the need for shackling and, indeed, asked the defendant's trial counsel if he had any objection to the shackling. Thus, the determination that no error occurred was simply based on that record containing the same finding of a manifest need for restraints that a *Boose* hearing would have produced. In the present case, the record does not contain any finding justifying the need for Jonathon's shackles.

¶ 156    Additionally, it is no *legal* answer to rely on the presumption that the trial court in this case followed the law and acted properly regarding Jonathon's shackling. *Supra* ¶ 72. "There can be no doubt that shackles impose physical burdens, pains, and restraints that tend to confuse and embarrass a defendant, burden his mental faculties and thereby materially abridge and prejudicially affect his constitutional rights." *People v. Rippatoe*, 408 Ill. App. 3d 1061, 1067 (2011) (citing *Deck*, 544 U.S. at 631). By avoiding the plain-error issue in the present case, the court not only calls into question the proper analysis for these claims, but also calls into question all existing case law on the subject.

¶ 157    Further, I observe that this court has codified its case law. Illinois Supreme Court Rule 430 mandates:

> "An accused shall not be placed in restraint of any form unless there is a manifest need for restraint to protect the security of the court, the proceedings, or to prevent escape. Persons charged with a criminal offense are presumed innocent until otherwise proven guilty and are entitled to participate in their defense as free persons before the jury or bench. Any deviation from this right shall be based on evidence specifically considered by the trial court on a case-by-case basis." Ill. S. Ct. R. 430 (eff. July 1, 2010).

Although this court adopted Rule 430 subsequent to Jonathon's juvenile proceeding, the principles of *Urdiales*, *Boose*, and *Staley* had long been established and were binding on the trial court. It does not speak well of this court to codify these fundamental principles in a new supreme court rule, and then ignore them for the sake of convenience. The court's treatment of the *Boose* error in this case denigrates the very case law that the court sought to codify by adopting Rule 430. Consequently, I fear that a majority of this court will "enforce" Rule 430 in much the same way Rules 431 and 711 have been "enforced," that is to say, the rule is nothing but a mere suggestion. This cavalier treatment of our rules not only undermines their force as law, but also erodes respect for judicial decisions. See *In re Denzel W.*, 237 Ill. 2d 285, 301 (2010) (Freeman, J., dissenting, joined by Burke, J.).

¶ 158    In the present case, the trial court knew or should have known that Jonathon was shackled during his juvenile proceeding. However, there was no hearing to determine whether the shackles were manifestly necessary. *That* was the *Boose* error. The parties agree that *Boose* error occurred. The court cannot make that fact disappear by refusing to

-32-

acknowledge its existence. While such legerdemain can be entertaining,[2] it has no place in a judicial opinion. Therefore, I would hold that error occurred.

¶ 159                                II. Plain Error

¶ 160    Jonathon procedurally forfeited appellate review of the trial court's error by failing to object. Pursuant to my dissent in *People v. Allen*, 222 Ill. 2d 340, 361 (2006) (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.), I conclude that the trial court's failure to hold a *Boose* hearing is reviewable under the second prong of the plain-error doctrine, which is based on fundamental fairness. Jonathon was denied a fair trial because a juvenile shackled without a showing of manifest need serves to erode the integrity of the judicial process and undermines the fairness of the juvenile proceeding. See *id*.

¶ 161    However, I agree with the court that section 5-101(3) of the Juvenile Court Act of 1987 (705 ILCS 405/5-101(3) (West 2004)) does not deny juveniles a right to a jury in juvenile proceedings because, in accordance with established law, juveniles do not have such a right.

¶ 162    Therefore, I would hold that, based on the second prong of the plain-error doctrine, the *Boose* error entitles Jonathon to a new juvenile proceeding. Accordingly, I dissent from the court's holding to the contrary. However, the new proceeding should be a bench hearing in accordance with established law.

¶ 163    JUSTICE BURKE, dissenting:

¶ 164    I agree with the majority that the evidence presented against Jonathon was sufficient to support the trial court's judgment. However, I do not agree with the majority's resolution of the other claims brought by Jonathon. Like Justice Freeman, I believe that it was error for Jonathon to be shackled during his trial without the benefit of a *Boose* hearing (see *People v. Boose*, 60 Ill. 2d 261 (1977)). Further, because the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/ 1-1 *et seq*. (West 2004)) has undergone a number of changes over the past dozen years, juvenile proceedings are now fundamentally more criminal in nature. As a result, I believe section 5-101(3) of the Act (705 ILCS 405/5-101(3) (West 2004)), which denies minors the right to a jury trial, violates the Illinois Constitution.

¶ 165                             I. *Boose* Violation

¶ 166    There is no dispute that Jonathon was shackled during much of his trial. There is also no dispute that the trial court never conducted a *Boose* hearing to determine whether there was a need for such restraints. Further, there is nothing in the record to indicate that restraints were necessary. Jonathon concedes that neither he nor his attorney objected to the shackles. However, he contends, as he did in the appellate court, that the trial court's failure to conduct

---

[2]"If I had a world of my own, *** [n]othing would be what it is, because everything would be what it isn't. And contrary wise, what it is, it wouldn't be, and what it wouldn't be, it would. You see?" Walt Disney, *Alice in Wonderland* (1951). Such is the state of this court's jurisprudence in this area.

a *Boose* hearing and to provide a justification for the restraints constitutes plain error and, thus, the trial court's finding that he is guilty of the offense of criminal sexual assault should be reversed.

¶ 167    The State agrees with Jonathon that the trial court erred by not holding a *Boose* hearing, but argues that the error did not rise to the level of plain error. The majority, however, ignores the State's concession of error and holds that no error occurred because "[t]here is nothing in the record to show that the trial judge was even aware of the shackles before Jonathon was called to testify, nor is there evidence in the record that the shackles were put back on when Jonathon finished his testimony." *Supra* ¶ 71. The majority then concludes:

> "[Without] *affirmative indication* in the record that the trial court was aware of the shackles before Jonathon was called to testify, *** we presume that the trial court acted properly and did not commit error with regard to Jonathon's shackling." (Emphasis added.) *Supra* ¶ 72.

¶ 168    The majority places the onus on *Jonathon* to show that the trial court was aware that he was wearing shackles and, because Jonathon has provided no evidence that the trial judge was aware of the shackles at the outset of trial, the majority finds that the trial judge was not responsible for them, was under no obligation to justify their use, and did not err by failing to hold a *Boose* hearing. I disagree.

¶ 169    The majority "presumes" that the judge was unaware of the fact that Jonathon was shackled until, on the third day of trial, Jonathon rose to take the stand, at which time the court ordered the shackles be removed. I, like Justice Freeman and the dissenting appellate justice below, find this presumed lack of awareness highly suspect. It is axiomatic that the responsibility for maintaining control of a courtroom rests with the trial judge. If we presume anything, therefore, we should presume that the trial judge was aware of the security measures being used in her own courtroom.

¶ 170    More importantly, the majority, by its ruling, approves of trial courts taking a "Sergeant Schultz" approach to the problem of unnecessary shackling (see *Kennedy v. Guess, Inc.*, 806 N.E.2d 776, 786 (Ind. 2004)).[3] Trial courts can simply turn a blind eye to the apparent common practice of shackling minors and, if no one brings the matter to the court's attention, there is no error because the trial judge "sees nothing."

¶ 171    But even if I accept the majority's premise that the trial court was unaware of the shackles, I cannot agree with the majority's holding that no error occurred. This is because I, like Justice Freeman, believe that trial judges have an affirmative obligation to ascertain whether the juveniles who come before them are shackled and, if so, to conduct a *Boose* hearing to determine whether restraints are necessary.

¶ 172    It has long been recognized that unnecessary shackling is fundamentally and inherently

---

[3]As the *Kennedy* court explained, "Sergeant Schultz" was a character in the television comedy Hogan's Heroes. In the show, Colonel Hogan and his men, while being held in a WWII German prisoner of war camp, were able to conduct extensive espionage operations. Each week, Sergeant Schultz, who guarded the prisoners, would see some evidence of Hogan's activities, but rather than take action, Schultz would simply declare, "I see n-o-t-h-i-n-g, n-o-t-h-i-n-g."

prejudicial. See *Boose*, 66 Ill. 2d at 265-66 ("It has been held that the shackling of the accused should be avoided if possible because: (1) it tends to prejudice the jury against the accused; (2) it restricts his ability to assist his counsel during trial; and (3) it offends the dignity of the judicial process."); *In re Staley*, 67 Ill. 2d at 37-38 (" 'A defendant may be shackled when there is reason to believe that he may try to escape or that he may pose a threat to the safety of people in the courtroom or if it is necessary to maintain order during the trial. [Citations.]' In the absence of such a showing, however, which must be established clearly on the record [citation], an accused cannot be tried in shackles whether there is to be a bench trial or a trial by jury." (quoting *Boose*, 66 Ill. 2d at 266)).

¶ 173      The United States Supreme Court observed in *Deck v. Missouri*, 544 U.S. 622 (2005), that the core concern regarding shackling is the negative impact it can have on three fundamental legal principles: the presumption of innocence, the right to counsel, and the dignity of the judicial process. *Deck*, 544 U.S. at 630-32. The Court went on to explain that "shackles 'impos[e] physical burdens, pains, and restraints ..., ... ten[d] to confuse and embarrass' defendants' 'mental faculties,' and thereby tend 'materially to abridge and prejudicially affect his constitutional rights.' " *Id*. at 631 (quoting *People v. Harrington*, 42 Cal. 165, 168 (1871)). We reaffirmed, in *Allen*, that "even when there is no jury, any unnecessary restraint is impermissible because it hinders the defendant's ability to assist his counsel, runs afoul of the presumption of innocence, and demeans both the defendant and the proceedings." *Allen*, 222 Ill. 2d at 347.

¶ 174      As Justice Freeman notes in his dissent, the damaging psychological effects that shackles can have on defendants (see *Deck*, 544 U.S. at 631), are even greater for minors and often exacerbate feelings of isolation, hopelessness, and insecurity. *Supra* ¶ 149 (Freeman, J., dissenting). These concerns do not cease to exist simply because the trial court "sees nothing." I agree, therefore, that it should not be "the responsibility of a juvenile in a delinquency hearing to ensure that he or she is provided a trial free from inherently prejudicial practices." *Supra* ¶ 144 (Freeman, J., dissenting).

¶ 175      I also wholeheartedly agree with Justice Freeman that allowing minors to be shackled throughout juvenile proceedings cannot be reconciled with the majority's stance that juveniles are not entitled to jury trials because " '[d]elinquency proceedings are *** protective in nature and the purpose of the Act is to correct and rehabilitate, not to punish.' " *Supra* ¶ 94 (quoting *In re Rodney H*., 223 Ill. 2d 510, 520 (2006)). The majority relies on the notion that juvenile court proceedings are "administered in a spirit of humane concern for, and promote the welfare of, the minor" (see *supra* ¶ 92 (quoting *In re A.G.*, 195 Ill. 2d 313, 317 (2001))), to support its conclusion that juvenile proceedings are not tantamount to a criminal trial. At the very least, it is disingenuous for the majority to say that juvenile proceedings "are administered in the spirit of humane concern" and at the same time find that leaving a minor shackled throughout his trial does not constitute error. If the majority genuinely believes that a *parens patriae* relationship still exists between juvenile courts and minors, it is imperative that courts be required to take a proactive role in eliminating unnecessary shackling. Moreover, as Justice Freeman points out, if trial courts have no affirmative obligation to determine whether the juveniles who come before them are being unnecessarily restrained, we are, in effect, permitting trial judges to abdicate their duty to

maintain control over their courtrooms and allowing law enforcement personnel to dictate the type of security measures that are being employed there.

¶ 176　There is one more important reason why I believe the majority is wrong to conclude that the trial court's failure to conduct a *Boose* hearing in this case is not error. The majority finds no error here because it presumes the trial court was unaware, at the beginning of the trial, that Jonathon was wearing shackles. Had this been a criminal prosecution of an adult, the same rule would apply and the adult defendant–like Jonathon here–would be unable to obtain relief on direct appeal. However, the adult defendant would be able to seek relief by filing a postconviction petition, arguing that counsel was ineffective for failing to alert the trial judge to the fact of the shackles. This avenue, however, is foreclosed to Jonathon because the Post-Conviction Hearing Act does not apply to juvenile proceedings. See *In re J.T.*, 221 Ill. 2d 338 (2006). Thus, based on the majority's finding that the trial court did not err, Jonathon and all juveniles similarly situated, have no opportunity–either directly or by collateral attack–to obtain relief. What this means is that a juvenile can be restrained throughout his entire trial and, despite all of the attendant concerns that shackling entails, have no forum in which to argue that he was prejudiced. Thus the majority, while maintaining that juvenile proceedings are not criminal in nature and are more protective of the rights of juveniles, actually places juveniles in a worse position, providing them with less protection than an adult. This is an illogical and untenable situation. While it may be appropriate to treat juveniles and adult defendants differently in some contexts, no one can seriously maintain that placing juveniles in a worse position than adult defendants is justifiable. Yet this is exactly what the majority has done.

¶ 177　Because the majority's finding that no error occurred leads to absurd results, I must conclude that the trial court had an affirmative obligation to determine whether Jonathon was shackled and that the trial court erred because it did not hold a hearing to determine whether shackles were justified.

¶ 178　　　　　　　　　　　　　II. Jury Trial

¶ 179　As discussed, the majority maintains that, in juvenile court proceedings, trial judges have no obligation to ensure that the minors who appeared before them are not unnecessarily shackled. This decision disadvantages juveniles, placing them in a worse position than an adult defendant. After so holding, the majority does an about face, denying juveniles the right to a jury trial by finding that juvenile proceedings are still very different from criminal prosecutions–protective in nature and designed to reach the goals of correcting and rehabilitating juvenile offenders.

¶ 180　While keeping juveniles in chains is hardly protective or promotes rehabilitation, my concerns go much deeper. I am persuaded by Jonathon's argument that the Juvenile Justice Reform Provisions of 1998, along with a number of other amendments to the Juvenile Court Act since 1999, have transformed the Act to such an extent that, for juveniles charged with criminal offenses, juvenile proceedings are now the equivalent of a criminal prosecution. Accordingly, I agree with Jonathon that juveniles charged with criminal offenses should have the right to a jury trial pursuant to the guarantees of the Illinois Constitution.

¶ 181    Article I, section 8, of the Illinois Constitution provides in pertinent part:

> "In criminal prosecutions, the accused shall have the right *** to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed."

¶ 182    At the same time, section 5-101(3) of the Juvenile Court Act of 1987 provides, "Minors shall not have the right to a jury trial unless specifically provided by this Article." 705 ILCS 405/5-101(3) (West 2006). The Act then specifically provides the right to a jury trial to juveniles in only three instances: when a juvenile is tried under the extended juvenile jurisdiction provision (705 ILCS 405/5-810 (West 2006)), when a juvenile is tried as a habitual juvenile offender (705 ILCS 405/5-815 (West 2006)), and when a juvenile is tried as a violent juvenile offender (705 ILCS 405/5-820 (West 2006)). For all others, even those who, like Jonathon, are charged with serious felony offenses and may be committed to the Department of Corrections until they reach the age of 21, a jury trial is unavailable.

¶ 183    Jonathon argues that by denying juveniles who are charged with committing a criminal offense the right to a jury trial, section 5-101(3) of the Act violates article I, section 8, of the Illinois Constitution. According to Jonathon, with the enactment of the Juvenile Justice Reform Provisions of 1998,[4] which became effective January 1, 1999, the juvenile justice system can no longer be viewed as the informal, confidential, nonadversarial system it was originally intended to be. He points out that the amendments explicitly changed the policy and purpose of the juvenile justice system, making the protection of citizens from juvenile crime and holding juvenile offenders accountable for their actions the primary goals of the Act. See 705 ILCS 405/4-101 (West 1999). In so doing, the amendments shifted the focus of the Act away from rehabilitation and toward punishment. See also *People v. Taylor*, 221 Ill. 2d 157, 165 (2006) (amendatory changes which became effective in 1999, "radically altered" the Juvenile Court Act and "largely rewrote article V of the Act to provide more accountability for the criminal acts of juveniles and, from all appearances, to make the juvenile delinquency adjudicatory process look more criminal in nature").

¶ 184    Even the terminology used regarding delinquency proceedings was changed by the reforms and now more closely tracks the terminology used in criminal proceedings. For example, juvenile proceedings are no longer "adjudication hearings," but "trials" (705 ILCS 405/5-105(17) (West 2006)), which no longer result in adjudications of delinquency, but rather, "findings of guilt" (705 ILCS 405/5-620 (West 2006)) which lead to a "sentencing hearing" wherein a minor may face the possibility of commitment in the Department of Corrections, Juvenile Division, for a number of years (705 ILCS 405/5-105(13), 5-620, 5-705, 5-710 (West 2006)). See also *People v. Taylor*, 221 Ill. 2d at 166-67.

¶ 185    In addition, pursuant to section 5-4-3(a)(3.5) of the Unified Code of Corrections (730 ILCS 5/5-4-3(a)(3.5) (West 2006)), every minor adjudicated guilty for the commission of any felony offense–like an adult felon–must provide a DNA sample to the Illinois Department of State Police so that genetic marker grouping analysis information may be included in state

---

[4]For a summary of the reform provisions for delinquency, see Michele M. Jochner, *An Overview of the Juvenile Justice Reform Provisions of 1998*, 87 Ill. B.J. 152 (1999).

-37-

and national DNA databases. Also, the legislature amended the confidentiality rules pertaining to juveniles adjudicated guilty of first degree murder, attempted first degree murder, aggravated criminal sexual assault, or criminal sexual assault, permitting access to their personal information by the general public. See 705 ILCS 405/5-901(5)(a) (West 2006). For juveniles adjudicated guilty of a criminal sexual offense, there are additional, serious collateral consequences: juveniles, like adults, are mandated to register under the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2006)), sometimes for life. With registration comes the potential that restrictions will be placed on the minor's movement (730 ILCS 150/7 (West 2006)), schooling (730 ILCS 152/121 (West 2006)), and housing (730 ILCS 150/8 (West 2006)), as well as other societal repercussions which could continue throughout the minor's lifetime.

¶ 186    Based on the above, Jonathon concludes that, for all juveniles charged with serious criminal offenses, amendatory changes to the Act have transformed the juvenile court system into an adversarial criminal justice system. Juveniles, like adult criminal defendants, are charged, tried, and found guilty, and can be sentenced to the Department of Corrections for significant periods of time. Accordingly, Jonathon asks that we dispense with the legal fiction that, for a juvenile charged with a criminal offense, a delinquency trial can still be characterized simply as "civil in nature." See *People ex rel. Daley v. Fitzgerald*, 123 Ill. 2d 175, 181 (1988); *In re S.R.H.*, 96 Ill. 2d 138, 144 (1983). He asks that we recognize juvenile proceedings for what they are–criminal prosecutions resulting in criminal convictions.

¶ 187    The majority rejects Jonathon's argument. Relying on case law, much of which was decided prior to the Act's amendment, the majority finds that juvenile proceedings are not criminal prosecutions. The majority also holds that, notwithstanding the recent amendments to the Act, rehabilitation remains an important purpose of the Act and that juvenile proceedings should not be deemed the equivalent of criminal proceedings simply because certain delinquent juveniles face some of the same collateral consequences as convicted criminals. In my opinion, however, the majority is missing the point.

¶ 188    The notion that juveniles should have a constitutional right to a jury trial in delinquency proceedings is not new. It has been considered on numerous occasions and in a number of jurisdictions, with varying results. In *In re J.W.*, 254 A.2d 334 (N.J. Super. Ct. 1969), the court noted:

> "The question of the constitutionality of juvenile proceedings without jury trials is hardly one which is free from doubt. ***
>
> Juveniles are afforded a jury trial by acts of the legislatures in nearly half the states. In England all children over the age of 14 charged in the juvenile courts with what would be indictable offenses are accorded the right of trial by jury. See 46 Cornell L.Q. 387 (1961); Colo. Rev. Stat. Ann. § 22-8-2 (1953); Tex. Rev. Civ. Stat., art. 2334 (Supp. 1950); Okla. Stat. tit. 10, § 102 (1941)."

¶ 189    In Illinois, the issue was considered by this court for the first time in *In re Fucini*, 44 Ill. 2d 305 (1970). In *Fucini,* the minor claimed that the Juvenile Court Act violated the sixth and fourteenth amendments of the Constitution of the United States and article II, section 5, of the Illinois Constitution of 1870, because it made no provision for trial by jury in

delinquency proceedings. The minor argued that "the sixth amendment right to a trial by jury made applicable to the States through the fourteenth amendment due-process clause (*Duncan* v. *Louisiana*, 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444; *Bloom* v. *Illinois*, 391 U.S. 194, 20 L. Ed. 2d 522, 88 S. Ct. 1477), should be extended to apply to juvenile court delinquency proceedings in light of the United States Supreme Court decision in *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428." See *In re Fucini*, 44 Ill. 2d at 307. *Gault* had extended to juvenile proceedings many of the same procedural protections afforded adult defendants in criminal prosecutions, but did not specifically address the right to trial by jury. Accordingly, we surveyed decisions from other jurisdictions (see *id.* at 307-08 (and cases cited therein)), and found a split among the jurisdictions which had considered the matter.

¶ 190      Ultimately, this court concluded in *Fucini* that neither the due process clause of the fourteenth amendment, nor the Illinois Constitution, required the right to a jury trial be extended to juvenile proceedings. The *Fucini* court reasoned:

> "[U]pon careful analysis of *Gault*, we find that the Supreme Court recognized *fundamental differences between adult and juvenile proceedings* and decided, wisely we believe, that to hold the full panoply of adult rights applicable to juvenile proceedings would strip those same proceedings of the unique benefits which they were designed to obtain." (Emphasis added.) *Id.* at 309.

¶ 191      Shortly after *Fucini* was decided, the United States Supreme Court rendered its decision in *McKeiver v. Pennsylvania*, 403 U.S. 528 (1971) (plurality op.). In *McKeiver*, the Court reviewed decisions of the supreme courts of Pennsylvania and North Carolina which upheld the adjudications of minors who had been tried without a jury trial. The minors argued before the Court that juvenile proceedings were "substantially similar to criminal trials" and thus the sixth amendment, imposed on the states by the due process clause of the fourteenth amendment, gave them the right to a trial by jury.

¶ 192      In a plurality decision, the Court initially recognized that a juvenile's right to a jury trial, as guaranteed by the sixth and fourteenth amendments, depended on whether juvenile proceedings could be deemed the equivalent of a criminal prosecution. The Court stated:

> "The right to an impartial jury '[i]n all criminal prosecutions' under federal law is guaranteed by the Sixth Amendment. Through the Fourteenth Amendment that requirement has now been imposed upon the States 'in all criminal cases which–were they to be tried in a federal court–would come within the Sixth Amendment's guarantee.' ***
>
> This, of course, does not automatically provide the answer to the present jury trial issue, if for no other reason than that the juvenile court proceeding has not yet been held to be a 'criminal prosecution,' within the meaning and reach of the Sixth Amendment, *and also has not yet been regarded as devoid of criminal aspects merely because it usually has been given the civil label*." (Emphasis added). *Id.* at 540-41, quoting *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).

¶ 193      Although the *McKeiver* plurality acknowledged "that the fond and idealistic hopes of the juvenile court proponents and early reformers of three generations ago have not been

realized,"[5] it, nonetheless, upheld the rulings of the Pennsylvania and North Carolina courts. *Id.* at 545. Employing the fundamental fairness standard to determine what process was due juveniles in juvenile court proceedings, the plurality concluded that "trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement." *Id.* One of the main reasons for so holding was the "possibility *** that the jury trial, if required as a matter of constitutional precept, *** will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." *Id.*

¶ 194    At the core of the plurality decision was the concern that the injection of the jury trial into the juvenile court system would "bring with it into that system the traditional delay, the formality, and the clamor of the adversary system," "remake the juvenile proceeding into a fully adversary process," "put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding," and threaten, if not destroy, "every aspect of fairness, of concern, of sympathy, and of paternal attention that the juvenile court system contemplates." See *id.* at 545, 550.

¶ 195    In contrast, Justice Douglas, joined by Justices Black and Marshall, wrote in dissent, "where a State uses its juvenile court proceedings to prosecute a juvenile for a criminal act and to order 'confinement' until the child reaches 21 years of age or where the child at the threshold of the proceedings faces that prospect, then he is entitled to the same procedural protection as an adult." *Id.* at 559 (Douglas, J., dissenting, joined by Black and Marshall, JJ.).

¶ 196    For the most part, states have relied on *McKeiver* to deny minors tried in juvenile proceedings the right to a jury trial. See B. Finberg, *Right to Jury Trial in Juvenile Court Delinquency Proceedings*, 100 A.L.R.2d 1241, 1242-43 (1965).[6] That is not to say, however,

---

[5]The plurality quoted the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime 7-9 (1967), as the basis for concluding as follows: " 'What emerges, then, is this: In theory the juvenile court was to be helpful and rehabilitative rather than punitive. In fact the distinction often disappears, not only because of the absence of facilities and personnel but also because of the limits of knowledge and technique. In theory the court's action was to affix no stigmatizing label. In fact a delinquent is generally viewed by employers, schools, the armed services–by society generally–as a criminal. In theory the court was to treat children guilty of criminal acts in noncriminal ways. In fact it labels truants and runaways as junior criminals. In theory the court's operations could justifiably be informal, its findings and decisions made without observing ordinary procedural safeguards, because it would act only in the best interest of the child. In fact it frequently does nothing more nor less than deprive a child of liberty without due process of law–knowing not what else to do and needing, whether admittedly or not, to act in the community's interest even more imperatively than the child's. In theory it was to exercise its protective powers to bring an errant child back into the fold. In fact there is increasing reason to believe that its intervention reinforces the juvenile's unlawful impulses. In theory it was to concentrate on each case the best of current social science learning. In fact, it has often become a vested interest in its turn, loathe to cooperate with innovative programs or avail itself of forward-looking methods.' " See *id*. at 544 n.5.

[6]The Alaska Supreme Court, in *RLR v. State*, 487 P.2d 27, 38 (Alaska 1971), agreed, based on *McKeiver*, that a juvenile had no right to a jury trial under the federal constitution, but

-40-

that in the nearly four decades following the *McKeiver* plurality decision, its contemporary validity has not come under fire. Courts and legal commentators, alike, have questioned whether "*McKeiver*'s factual predicate–that the sanctions that juvenile courts impose are not 'punishment'–has been superseded by the new reality of juvenile justice," *i.e.*, that "changes in States' juvenile codes have fostered a substantive, punitive convergence with criminal courts." See Barry C. Feld, *The Constitutional Tension Between Apprendi and McKeiver: Sentence Enhancements Based on Delinquency Convictions and the Quality of Justice in Juvenile Courts*, 38 Wake Forest L. Rev. 1111, 1154 (2003).

¶ 197    One commentator has noted:

"The strongest and most fundamental challenges [to *McKeiver*] contend that changes in juvenile justice administration require a re-examination of *McKeiver*'s factual premise that juvenile courts only treat, rather than punish, delinquents. *** [V]irtually every state has revised and greatly 'toughened' its juvenile codes in the decades since that decision. Whether or not the Court properly decided *McKeiver* in 1971, legislative amendments to states' juvenile codes have fostered a punitive convergence with criminal courts and completely eroded the rationale for less effective procedural safeguards in delinquency trials. In short, the unproved factual premise on which the Court based *McKeiver* simply does not exist today." *Id*. at 1156-57.

¶ 198    As the article above suggests, changes in state juvenile codes have prompted a new wave of constitutional challenges to state statutes that deny juveniles the right to a jury trial. See, *e.g.*, *In re Hezzie R.*, 580 N.W.2d 660 (Wis. 1998); *In re J.F.*, 714 A.2d 467 (Pa. Super. Ct. 1998). In 2008, the Kansas Supreme Court, confronted with such a challenge, broke new ground with its decision in *In re L.M.,* 186 P.3d 164 (Kan. 2008).

¶ 199    In *L.M.*, a 16-year-old minor was charged with aggravated sexual battery and possession of alcohol. He was found guilty of both charges in a bench trial and sentenced to 18 months' incarceration (the sentence was later stayed and he was then placed on probation until his twentieth birthday). L.M. was also required to complete sex offender treatment and to register as a sex offender. On appeal, L.M. challenged the constitutionality of the Kansas statute which denied him the right to a jury trial.

¶ 200    On review, the Kansas Supreme Court first acknowledged that, in *Findlay v. State*, 681 P.2d 20 (Kan. 1984), it had previously held that juveniles did not have a constitutional right to a jury trial under either the federal or state constitutions. However, the court noted that

nonetheless ruled that the Alaska constitution afforded such a right. Quoting *In re Winship*, 397 U.S. 358, 365-66 (1970), which held: "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts, for '[a] proceeding where the issue is whether the child will be found to be "delinquent" and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution,' " the Alaska court concluded that "whenever a child in a delinquency proceeding is charged with acts which would be a crime, subject to incarceration if committed by an adult, the Alaska Constitution guarantees him the right to jury trial." *RLR*, 487 P.2d at 33.

*Findlay* reached that conclusion because the sixth amendment right applies only to "criminal prosecutions" and, under the Kansas juvenile code as it existed when *Findlay* was decided, a juvenile adjudication was not the equivalent of a criminal prosecution. The *L.M.* court noted that similar reasoning had been employed by the *McKeiver* plurality, which *Findlay* had adopted.

¶ 201        The *L.M.* court then went on to note that, subsequent to *Findlay*, the Kansas Juvenile Justice Code had been revised and that changes in the Code as a result of these revisions had "eroded the benevolent parens patriae character" that had previously distinguished the Kansas juvenile justice system from the adult criminal justice system. *In re L.M.*, 186 P.3d at 170. Specifically, the court held that, in 1982, the Juvenile Code had "focused on rehabilitation and the State's parental role in providing guidance, control, and discipline" (*id*. at 168) but that the revised Juvenile Code now provided:

> "The primary goals of the juvenile justice code are to promote public safety, hold juvenile offenders accountable for their behavior and improve their ability to live more productively and responsibly in the community." Kan. Stat. Ann. § 38-2301 (West 2006).

According to the Kansas Supreme Court, this shift in purpose brought Kansas' revised code more in alignment with the adult criminal justice system. *In re L.M.*, 186 P.3d at 168. The *L.M*. court also noted that Kansas' revised code had incorporated language similar to that used in the criminal context and had established a sentencing matrix for juveniles which emulated the Kansas Sentencing Guidelines for criminal convictions. See *id*. at 168-69. Finally, the court noted that some of the protections that previously had been afforded juveniles, such as confidentiality of records, had been removed. Accordingly, the court held:

> "The United States Supreme Court relied on the juvenile justice system's characteristics of fairness, concern, sympathy, and paternal attention in concluding that juveniles were not entitled to a jury trial. *McKeiver*, 403 U.S. at 550, 91 S. Ct. 1976. Likewise, this court relied on that parens patriae character in reaching its decision in *Findlay.* However, because the juvenile justice system is now patterned after the adult criminal system, we conclude that the changes have superseded the *McKeiver* and *Findlay* Courts' reasoning and those decisions are no longer binding precedent for us to follow. Based on our conclusion that the Kansas juvenile justice system has become more akin to an adult criminal prosecution, we hold that juveniles have a constitutional right to a jury trial under the Sixth and Fourteenth Amendments." *Id*. at 170.

¶ 202        The *L.M.* court also considered whether juveniles had a right to a jury trial under their state constitution. Looking to section 10 of the Kansas Constitution Bill of Rights, the court noted that it guaranteed "a speedy public trial by an impartial jury" to an accused "[i]n any prosecutions." (Emphasis omitted.) *Id.* at 171 (quoting Kan. Const. Bill of Rights § 10). Because the revised juvenile code referred to its proceedings as "prosecutions," the court concluded that section 10, by its plain language, applied to juvenile proceedings when the juvenile is charged with violating the criminal laws of the state. *Id*. at 172. As a result, the court declared that, as a new rule of procedure in Kansas, juveniles have the right to a jury

trial under the sixth and fourteenth amendments of the United States Constitution, as well as section 10 of the Kansas Constitution's Bill of Rights. *Id.*

¶ 203    In 2009, the Louisiana Supreme Court was confronted by a similar claim in *In re A.J.*, 2009-0477 (La. 12/1/09), 27 So. 3d 247. In *A.J.* a 14-year-old minor was charged with six counts of aggravated rape. He moved for a jury trial, arguing that *McKeiver* "left open the possibility that the Court would extend the right [to a jury trial for juveniles] in the future if the line between delinquency proceedings and adult criminal prosecutions became sufficiently blurred." *Id.* at 2. A.J. then contended that, in his case, the proceedings would be sufficiently like an adult criminal proceeding and, for that reason, he should be entitled to a jury trial. A.J. also argued that, if he was found guilty, he would be subject to confinement until he reached the age of 21. He contended that proceedings which might result in confinement for more than six months are fundamentally unfair in the absence of a jury. See *Duncan v. Louisiana*, 391 U.S. 145 (1968) (more than six months' incarceration is the threshold upon which the right to a jury trial attaches). After hearing the arguments of counsel, the juvenile court judge ruled in A.J.'s favor and granted his motion for a jury trial, declaring that the Louisiana statute which denied juveniles a trial by jury violated both the federal and state constitutions.

¶ 204    The State appealed that judgment to the Supreme Court of Louisiana, which reversed. The Louisiana Supreme Court held that *McKeiver*, as well as the Louisiana case, *State ex rel. D.J.*, 2001-2149 (La. 5/14/02), 817 So. 2d 26, which had relied on *McKeiver*, were still controlling law. In reversing, the Louisiana Supreme Court noted that the juvenile court's rationale for granting A.J.'s request for a jury trial was its "concern that juvenile justice has become increasingly like criminal justice." *In re A.J.*, 2009-0477 at 15, 27 So. 3d at 259. The court also recognized that, based on similar concerns, the Kansas Supreme Court, in *In re L.M.*, had held that juveniles in that state had the right to a jury trial under both the federal and Kansas constitutions. However, the Louisiana Supreme Court distinguished *In re L.M.*, stating, "Louisiana, in contrast, has gone through no comparable wholesale revision [of its juvenile code]." *Id.* at 263. Furthermore, the court pointed out that in *In re C.B.*, 97-2783 (La. 3/4/98), 708 So. 2d 391, it had held unconstitutional a statute which would have allowed transfer of adjudicated delinquents to adult correctional facilities. Its rationale for doing so was that the statute would have "tilted the scales" so that juvenile proceedings would no longer be civil proceedings with a focus on rehabilitation, but rather "purely criminal" proceedings. Also, in *State v. Brown*, 2003-2788 (La. 7/6/04), 879 So. 2d 1276, the Louisiana Supreme Court had held a juvenile adjudication was not a conviction for any crime and, therefore, could not be counted as a prior conviction for purposes of habitual offender sentencing. To do so, said the court, would subvert the civil trappings of the juvenile adjudication

¶ 205    The *A.J.* court then held that, based on its rulings in *In re C.B.* and *Brown*, the boundary between juvenile delinquency proceedings and adult criminal prosecutions was returned to its *status quo ante*. *In re A.J.*, 2009-0477 at 16, 27 So. 3d at 247. And since A.J. could not point to any laws which postdated its rulings in *In re C.B.* and *Brown* which made juvenile justice more criminal in nature, the *A.J.* court concluded that it had "closely monitored the 'blurred boundary' at issue" and had found that boundary to be properly restored. *Id.* at 17.

Therefore, it held the juvenile court had erred in finding the Louisiana statute unconstitutional.

¶ 206   It is clear that the situation in Illinois is much more akin to Kansas than it is to Louisiana. In Illinois, our Juvenile Court Act of 1987 was "radically altered," making it much more criminal in nature. See *People v. Taylor*, 221 Ill. 2d at 165. Where once the only policy and purpose of the Act was to provide each minor the "care and guidance" necessary to serve the minor's "moral, emotional, mental, and physical welfare" (705 ILCS 405/1-2 (West 1996)), our Juvenile Court Act now explicitly provides that two of the primary purposes of the juvenile justice system are the protection of the community and holding juvenile offenders accountable for their acts. See 705 ILCS 405/5-101(1)(a), (1)(b) (West 2006). Thus, in Illinois as in Kansas, the singular goal of rehabilitating minors has been replaced with punishment.

¶ 207   Further, with the enactment of the 1998 revisions, the Act imported more adversarial language with regard to juvenile proceedings: "guilty plea," "finding of guilt," "trial" and "sentencing" are now the proper terminology replacing "admission," "finding of delinquency," "adjudication hearing," and "dispositional hearing." Also, the 1998 revisions to the Act gave the State's Attorney discretion "to prosecute" a delinquency petition (705 ILCS 405/5-330 (West 1998)), and also provided that any minor over the age of eight should be issued a summons "[u]pon the commencement of a delinquency prosecution" (705 ILCS 405/5-525 (West 1998)).

¶ 208   In *People ex rel. Devine v. Stralka*, 226 Ill. 2d 445 (2007), this court referred to delinquency proceedings as "prosecutions" and certain provisions of the Act use the term "prosecution" in reference to delinquency proceedings. In addition, SORA (730 ILCS 150/2 (West 2004)) and the Child Murderer and Violent Offender Against Youth Registration Act (730 ILCS 154/5 (West 2006)), specifically provide that, for the purposes of these acts, a juvenile delinquency "adjudication" shall have the same meaning as a "conviction." And after this court decided *Taylor*, the legislature negated our decision by amending the felony escape statute (720 ILCS 5/31-6 (West 2008)) to provide that an adjudication for a felony offense is to be treated as a felony conviction.

¶ 209   In *In re G.O.*, 191 Ill. 2d 37 (2000), which was decided shortly after the Act was revised, Justice Heiple wrote in dissent that the minor, G.O., should have had the right to a jury trial under article I, section 8, of the Illinois Constitution. In *G.O.*, a 13-year-old minor was charged with first degree murder, aggravated battery and aggravated battery with a firearm on an accountability theory. The trial court adjudicated him delinquent and, pursuant to section 5-33.1 of the Act, ordered him committed to the Department of Corrections, Juvenile Division, until his "21st birthday, without the possibility of parole, furlough, or non-emergency authorized absence for a period of 5 years." See 705 ILCS 405/5-33(1.5) (West 1996). *In re G.O.*, 191 Ill. 2d at 40-41. On appeal, the appellate court had ruled that denying G.O. a jury trial violated the equal protection clauses of our federal and state constitutions because G.O. was subject to the same mandatory determinate sentence required whenever a minor is adjudicated a habitual or violent juvenile offender, yet minors who are tried as

habitual juvenile offenders or violent juvenile offenders are entitled to a jury trial.[7] *In re G.O.*, 304 Ill. App. 3d 719, 728 (1999).

¶ 210    A majority of this court reversed the appellate court, finding no equal protection violation because section 5-33(1.5) was enacted as part of Public Act 88-680, which had been declared unconstitutional in violation of the single subject clause of our Illinois Constitution. Thus, section 5-33(1.5) was void and not applicable to G.O. Justice Heiple dissented, reasoning:

> "In past decisions, this court has emphasized that delinquency proceedings are not criminal in nature because the overriding concern of these proceedings is rehabilitation, not punishment. See, *e.g.*, *In re Beasley*, 66 Ill. 2d 385, 389 (1977); *In re W.C.*, 167 Ill. 2d 307, 320 (1995). The prior analysis on this issue is flawed, however, because it relied on an outmoded characterization of the juvenile justice system. Much has changed in the last three decades since the United States Supreme Court refused to extend the right to a jury trial to juvenile delinquency proceedings on the grounds that the jury trial 'will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding.' *McKeiver v. Pennsylvania*, 403 U.S. 528, 545, 29 L. Ed. 2d 647, 661, 91 S. Ct. 1976, 1986 (1970). Rehabilitation no longer occupies its once preeminent status in the juvenile justice system; punishment and public safety are now the juvenile justice system's overriding concerns. ***
>
> * * *
>
> In *Beasley*, the court implied that recognizing a juvenile delinquency proceeding as a criminal prosecution would lead to the abandonment of the intimate, informal protective proceeding of the juvenile justice system altogether. *In re Beasley*, 66 Ill. 2d at 390. This fear was unwarranted when *Beasley* was decided in 1977, and it is even more so now. The incorporation of virtually every aspect of criminal procedure (except the jury trial) into juvenile proceedings has not undermined the justification for separate adult and juvenile justice systems. Moreover, the right to a jury trial has already been incorporated into the juvenile justice system for certain specific offenses. See 705 ILCS 405/5-815(d), 5-820(d) (West 1998) (providing right to jury trial for habitual and violent juvenile offenders). The failure to provide the right to a jury trial in delinquency proceedings should not be treated as a method of shielding the juvenile defendant from the adult criminal justice system. Rather, it should be recognized that most attributes of the adult criminal justice system are already permanent features of the juvenile justice system. A juvenile, no less than an adult, is entitled to the protection of a jury trial when faced with incarceration in the Illinois Department of Corrections. The failure to provide a jury trial should be seen for what

---

[7]I note that the appellate court rejected G.O.'s due process challenge to the statute because it felt compelled to do so by precedent. Yet the court expressed concern that "[t]he passage of time has weakened the underpinnings of *McKeiver* and *Fucini*" because "[t]oday's juvenile justice system is a far cry from the aspirations of Jane Addams." 304 Ill. App. 3d at 724-25.

it truly is: an anachronism and a denial of equal justice for all." *In re G.O.*, 191 Ill. 2d at 60-61, 63-64 (Heiple, J., dissenting).

¶ 211    Although the comments above are contained in Justice Heiple's dissent, the majority did not necessarily disagree. The majority responded:

"Contrary to Justice Heiple's assertions, we do not hold that a due process argument is foreclosed by *Fucini*. Instead, we hold that, in the absence of the mandatory sentencing provision, respondent does not ask this court to reconsider *Fucini*. The argument considered by Justice Heiple is not before this court and we express no opinion upon its merits." *In re G.O.*, 191 Ill. 2d at 44 n.3.

¶ 212    Since *In re G.O.*, additional legislation and case law has made the juvenile justice system even more criminal in nature. For instance, in *In re A.G.*, 195 Ill. 2d 313 (2001), we held that juvenile offenders, like adult offenders, are subject to Supreme Court Rule 604(d), governing appeals from judgments entered on a guilty plea. Our decision in *A.G.* was premised on our finding that the 1998 revisions to the Act had "resulted in juvenile proceedings that are similar to adult criminal proceedings" (*id.* at 317-19), and that these amendments "represent[ ] a fundamental shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law" (*id.* at 317).

¶ 213    Also, relying on the amendments and the corresponding shift in purpose of the Juvenile Court Act, this court has upheld legislation which requires juveniles, like adults, to register for life under SORA, if found guilty of committing certain sex offenses (see *In re J.W.*, 204 Ill. 2d 50 (2003)). We have also upheld legislation which requires non-sex-offender delinquents found guilty of an offense which would be a felony if committed by an adult, to have their DNA extracted and indexed in the national registry, just like an adult convicted felon (*In re Lakisha M.*, 227 Ill. 2d 259 (2008)).

¶ 214    Finally, in *People ex rel. Devine v. Stralka*, 226 Ill. 2d 445 (2007), we ruled that a juvenile court judge did not have discretion to vacate findings of delinquency based on subsequent good behavior. This ruling was based, in part, on the fact that section 5-615(1) of the Juvenile Court Act (705 ILCS 405/5-615(1) (West 2004)) did not permit the court to enter an order of continuance under supervision if the State's Attorney objected. That had not always been the case, however. Prior to 1982, the State's Attorney did not have that right. See *People ex rel Devine v. Stralka*, 226 Ill. 2d at 466 (Burke, J., specially concurring, joined by Freeman and Fitzgerald, JJ.). I noted, in *Stralka*, that the amendment to the statute had taken away a tool that had previously been at the disposal of juvenile court judges and, in so doing, contributed to the erosion of the *parens patriae* character of the Juvenile Court Act. Our decision in *Stralka* demonstrates another way that the Act has become more punitive in nature.

¶ 215    Affording juveniles the benefit of a jury trial is not a completely foreign concept. Our statutes provide that, if a juvenile is to be tried in juvenile court under the provision providing for extended jurisdiction juvenile prosecution (705 ILCS 405/5-810 (West 2006)), or if a juvenile is to be tried in juvenile court as a Habitual Juvenile Offender (705 ILCS 405/5-815 (West 2006)) or as a Violent Juvenile Offender (705 ILCS 405/5-820 (West

2006)), such juvenile has the right to a trial by jury. The Act offers no rationale for permitting jury trials in these specific instances. In *People ex rel. Birkett v. Konetski,* 233 Ill. 2d 185, 205 (2009), however, this court suggested that jury trials are granted in these instances because these "proceedings involve severe deprivations of liberty" in that a minor found guilty in an extended jurisdiction juvenile prosecution receives both a juvenile sentence and an adult criminal sentence, which is stayed on the condition that the minor complies with the juvenile sentence (705 ILCS 405/5-810(4) (West 2006)) and a minor found to be a habitual juvenile offender or a violent juvenile offender must be committed to the Department of Corrections, Juvenile Division, until the age of 21 with no possibility of parole, furlough, or nonemergency absence (705 ILCS 405/5-815(f), 5-820(f) (West 2006)).

¶ 216     In the case at bar, Jonathon was subject to, and then given, a sentence which is a "severe deprivation of liberty." Jonathon was committed to the "Illinois Department of Juvenile Justice for an indeterminate term which shall automatically terminate in 15 years or upon the delinquent minor attaining the age of 21 years, whichever comes first." Certainly, this sentence is as onerous as the sentences required for habitual or violent juvenile offenders.

¶ 217     In light of everything set forth above, I believe that legislative changes to the Juvenile Court Act since *Fucini* and *McKeiver* were decided, particularly the 1998 revisions to the Juvenile Court Act of 1987, have placed juvenile offenders on par with adult offenders and, as a practical matter, have resulted in a convergence of the juvenile justice system with the adult justice system. The revisions to our Juvenile Court Act have turned juvenile delinquency proceedings into an adversarial system in which punishment of the minor and protection of society are the primary goals. The protective *parens patriae* ideals, which were the hallmark of the juvenile justice system which existed when *Fucini* and *McKeiver* were decided, have given way to a new reality–one in which juveniles are treated more like adult criminal defendants. I conclude, therefore, that when a minor is charged and tried in juvenile court for having committed an offense that would be a felony if committed by an adult, and the minor is subject to the possibility of being confined for more than six months, it can scarcely be denied that the delinquency prosecution is the legal equivalent of a criminal prosecution. Accordingly, it is my view that the right to a jury trial, granted to an accused "in criminal prosecutions" by article I, section 8, must apply to juveniles who are tried within the juvenile justice system on charges that they violated a criminal statute when an adult charged with the same offense would have such a right.

¶ 218                                                        III. Conclusion

¶ 219     The majority imposes no obligation on trial courts to determine whether the juveniles who appear before them are shackled and, because in this case Jonathon could not demonstrate that the trial court was aware that he was kept in shackles during his trial, the majority finds that the trial court did not err by failing to conduct a *Boose* hearing. Since the Post Conviction Hearing Act does not apply to juvenile proceedings, the majority's ruling deprives Jonathon of any opportunity for review of the fact of his shackling. Thus, the majority's holding that no error occurred places Jonathon in a worse position than if he were an adult defendant.

¶ 220    After so holding, the majority then relies on the "protective nature" of juvenile proceedings "administered in a spirit of humane concern" to deny Jonathon the right to a jury trial. In this way, the majority has managed to give juveniles the worst of all possible worlds.

¶ 221    For the foregoing reasons, I dissent.

¶ 222    **Separate Opinions Upon Denial of Rehearing**

¶ 223    JUSTICE THOMAS, writing in support of denial of rehearing:

¶ 224    In his petition for rehearing, Jonathon asks this court to retain jurisdiction of the case pursuant to this court's supervisory authority, and remand the cause to the trial court for a hearing on the issue of whether the trial court was aware of Jonathon's shackles, so that this court can determine whether plain error occurred. This court has denied Jonathon's petition for rehearing. As noted in our opinion, there is no evidence in the record that the trial court committed error in this case with regard to Jonathon's shackling. Therefore, there is no need to remand this cause to the trial court for further hearings, or for this court to determine whether plain error occurred.

¶ 225    Nonetheless, three justices have dissented from the denial of rehearing. Justice Freeman writes that if the trial court knew that Jonathon was shackled, then the trial court committed plain error entitling Jonathon to a new juvenile proceeding. Justice Burke would allow Jonathon's request for a remand and would allow him the opportunity to make a record to show that the trial court was aware of Jonathon's shackles at the outset. Justice Burke states that if the trial court was aware of the shackles but did not hold a *Boose* hearing or require the shackles to be removed, the court committed plain error and Jonathon should be granted a new trial. Justice Kilbride believes that the trial court's failure to conduct a *Boose* hearing to determine the manifest need to shackle Jonathon should be reviewed as plain error under the fundamental fairness prong of the plain-error doctrine.

¶ 226    Although we find no evidence that the trial court committed error in this case, we briefly address the issue of plain error, as it has been raised by the dissenting justices. As set forth below, even if the trial court indicated that it knew that Jonathon was shackled during his juvenile proceeding, the error did not amount to plain error requiring reversal of Jonathon's conviction of criminal sexual assault. Consequently, we disagree with the dissenting justices that rehearing is required in this case.

¶ 227    The plain-error doctrine allows a reviewing court to consider unpreserved error when: (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) a clear or obvious error occurs, and the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). The second prong is not at issue in this case. Although the dissenting justices would find plain error, assuming the trial court was aware of the shackles, based solely on the fact that Jonathon was shackled and the trial court did not conduct a *Boose* hearing, the court in *People v. Allen*, 222 Ill. 2d 340 (2006), considered and rejected the argument that a shackling error alone is an error so serious that it affects the

-48-

fairness of a defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence. Consequently, contrary to the position of the dissenting justices, a shackling error alone does not constitute *per se* reversible error.

¶ 228     In *Allen*, the court considered the defendant's claim that it was error for him to be forced to wear an electronic security belt as a restraining device at trial. The court first held that the trial court's failure to follow the procedures set forth in *Boose* before ordering the defendant to continue to wear an electronic stun belt during his trial constituted a due process violation. *Allen*, 222 Ill. 2d at 349. The court took judicial notice of the routine use of stun belts on felons in Will County cases in support of its holding that stun belts should be subject to a *Boose* hearing. *Id.* at 356. However, the defendant did not even mention the electronic restraint until the third day of his trial and, even then, defense counsel made an alternative suggestion to remove the restraint, but did not ask that an objection be noted on the record, or that a *Boose* hearing be held. *Id.* at 353.

¶ 229     Although the court found that requiring a defendant to wear a stun belt throughout his trial without a *Boose* hearing amounted to a due process violation, the court nonetheless held that the error did not constitute *per se* reversible error. *Allen*, 222 Ill. 2d at 353-54. The error did not result in fundamental unfairness or cause a severe threat to the fairness of the defendant's trial. *Id.* at 360. Further, the defendant did not claim, nor could he claim, that the evidence presented was closely balanced, or that his presumption of innocence, ability to assist his counsel, or the dignity of the proceedings was compromised. *Id.* at 353. Accordingly, because the defendant could not demonstrate plain error, the defendant forfeited his right to review of the issue. *Id.* at 360.

¶ 230     Because the error in this case was not so serious that it affected the fairness of Jonathon's trial, or the integrity of the judicial process, only the first prong of the plain error analysis is at issue. If the trial court was aware that Jonathon was shackled during trial and did not conduct a *Boose* hearing, the error amounted to plain error only if the evidence was so closely balanced that the error alone threatened to tip the scales of justice against Jonathon.

¶ 231     Jonathon contended that the evidence in this case was so closely balanced as to give rise to a reasonable doubt of guilt on the sexual assault charges. Therefore, he argues, it is impossible to conclude that the shackling had no adverse effect on the proceedings.

¶ 232     We disagree with Jonathon that the evidence in this case was so closely balanced that the shackling error alone threatened to tip the scales of justice against him. Jonathon's trial was a bench trial before a judge, not a jury. Consequently, the concerns that shackling will prejudice a jury are not present. See *Staley*, 67 Ill. 2d at 37. Rather, in cases where there is no jury, courts consider whether an accused's presumption of innocence, his ability to cooperate with his attorney and defense, or the dignity of the judicial process, were compromised. Jonathon does not allege, and there is no evidence in the record, that his shackles compromised his presumption of innocence, his ability to cooperate with his attorney and defense, or the dignity of the judicial process.

¶ 233     Moreover, although Jonathon characterizes the evidence of the criminal sexual assault as simply a credibility contest between himself and C.H., so closely balanced that the shackles may have tipped the balance in favor of C.H.'s credibility, it is clear from the record

that the trial judge gave due consideration to all the evidence and testimony in finding Jonathon guilty. In fact, in rendering its decision, the trial judge stated that, "[b]oth counsel are correct in that this case really does come down to the issue of credibility *although this is not a case where the Court only has his word versus her word to examine. The evidence before me consists of the observations and testimony of multiple witnesses as well as physical evidence.*" (Emphasis added.) The trial judge then extensively detailed the testimony of the parties and all the witnesses, and recognized that there were inconsistencies in the testimony of both C.H. and Jonathon.

¶ 234     The trial court noted that it had compared Jonathon's testimony to the statements that Jonathon gave to the investigators and other individuals. The trial court noted the discrepancy concerning what time Jonathon asked Destiny for $40, with Jonathon testifying he got the money after encountering C.H. around midnight or 12:30 a.m., while Destiny testified that Jonathon asked her for the money around 10:45, right before she went to bed. The trial court also noted Jonathon's changing story concerning his encounter with C.H., and observed that Jonathon and G.W. had approximately 45 minutes to an hour to discuss what they would tell police before they opened the door to the townhouse at 2701B Campbell. The trial court found it significant that Jonathon and G.W. refused to open the door or respond to repeated police requests that they come out during that time period.

¶ 235     In contrast, C.H.'s statements to Deputy Good and paramedic Ramey were made at the scene immediately after the attack, so that C.H. would have no time to make up a story. The trial court further noted the different responses of C.H. and Jonathon when Deputy Good came upon the scene and announced himself. Jonathon and G.W. turned and fled, while C.H. ran toward Good and collapsed on the street. The trial court also stated that it considered not only the content of the parties' testimony, but also the manner and demeanor of the parties while testifying.

¶ 236     The trial court then concluded:

> "The bottom line having considered all the evidence and the testimony, the manner and demeanor of the witnesses while testifying, the statements of the witnesses, any impeachment or inconsistencies, the physical injuries, the damage to the clothing, the actions taken in the face of police intervention and the time frame, I do believe [C.H.] was sexually assaulted by [Jonathon] as she has described."

¶ 237     The trial judge thoughtfully and thoroughly considered the evidence in this case. Although there were inconsistencies in the testimony of both C.H. and Jonathon, this case did not turn solely on C.H.'s testimony versus Jonathon's testimony. Given the testimony of all the witnesses, as well as the physical evidence in the case, we cannot say the evidence was so closely balanced that the shackling error alone threatened to tip the scales of justice against Jonathon. "[M]inor discrepancies in the evidence, whether between two witnesses or within the testimony of one witness, are not unusual." *In re M.W.*, 232 Ill. 2d 408, 438 (2009). Thus, even if the trial court was aware of Jonathon's shackles and failed to conduct a *Boose* hearing, the error did not amount to plain error which would require reversal of Jonathon's conviction of criminal sexual assault. Therefore, there is no need to grant Jonathon's petition for rehearing and remand the case to the trial court. Even if the trial court

stated for the record that it knew Jonathon was shackled during his juvenile proceedings, that information would not alter our disposition of this case.

¶ 238   JUSTICE KARMEIER joins in this opinion in support of denial of rehearing.

¶ 239   JUSTICE THEIS, writing in support of denial of rehearing:

¶ 240   I continue to agree with the majority's determination that the record is devoid of any indication that the trial court committed error with regard to Jonathon's shackling. Accordingly, Jonathon's petition for rehearing should be denied. I cannot, however, join with my colleagues writing in support of the denial of rehearing because the plain-error analysis in which they engage is unnecessary in the absence of trial error.

¶ 241   CHIEF JUSTICE KILBRIDE, dissenting upon denial of rehearing:

¶ 242   Consistent with my position in *People v. Allen*, 222 Ill. 2d 340, 360 (2006) (Freeman, J., dissenting, joined by McMorrow & Kilbride, JJ.), I believe that the trial court's failure to conduct a *Boose* hearing to determine the manifest need to shackle Jonathon should be reviewed as plain error under the fundamental fairness prong of the plain-error doctrine. The majority here, however, concluded that "there is no affirmative indication in the record that the trial court was aware of the shackles before Jonathon was called to testify, so we presume that the trial court acted properly and did not commit error with regard to Jonathon's shackling." *Supra* ¶ 72.

¶ 243   In his petition for rehearing, respondent requests that this court exercise its supervisory authority to retain jurisdiction, remand, and allow the trial court to review the record and determine whether it was aware that Jonathon was shackled. I agree with Justice Freeman and Justice Burke that the circumstances of this case warrant the relief requested by respondent in his petition for rehearing. Accordingly, I dissent from the denial of Jonathon's petition for rehearing.

¶ 244   JUSTICE FREEMAN, dissenting upon denial of rehearing:

¶ 245   This court concludes that "there is no affirmative indication in the record that the trial court was aware of the shackles before Jonathon was called to testify, so we presume that the trial court acted properly and did not commit error with regard to Jonathon's shackling." *Supra* ¶ 72. In his petition for rehearing, Jonathon asks us to retain jurisdiction over this case, pursuant to this court's supervisory authority, and remand so that the circuit court may state for the record whether it knew that Jonathon was shackled during his juvenile proceeding.

¶ 246   I would allow rehearing. If the circuit court knew that Jonathon was shackled, then I believe that the court committed plain error entitling Jonathon to a new juvenile proceeding. Therefore, I dissent from the denial of the petition for rehearing.

¶ 247   The Illinois Constitution vests this court with supervisory authority over all the lower courts of this state. Ill. Const. 1970, art. VI, § 16. Beyond our leave to appeal docket, the use of supervisory orders is disfavored. *People ex rel. Birkett v. Bakalis*, 196 Ill. 2d 510, 513

(2001). Generally, this court will not issue a supervisory order absent a finding that: (1) the normal appellate process will not afford adequate relief, (2) the dispute involves a matter important to the administration of justice, or (3) our intervention is necessary to prevent an inferior tribunal from acting beyond the scope of its authority. *Id.* I continue to firmly recognize "that fundamental fairness, the need for the development of a uniform body of law, and the court's responsibility to administer the judicial system may dictate the use of the court's supervisory authority to provide relief in specific circumstances." *In re J.T.*, 221 Ill. 2d 338, 365 (2006) (Freeman, J., dissenting).

¶ 248                                    I. Adequate Relief

¶ 249    This case presents at least two reasons for this court to issue a supervisory order. First, the normal appellate process will not afford adequate relief to Jonathon. If this were a criminal case with an adult defendant, absent plain error, we would honor the defendant's default (see *People v. Bannister*, 232 Ill. 2d 52, 65 (2008)) and leave the defendant to a possible collateral remedy pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2006)).

¶ 250    However, our appellate court has repeatedly held that the Post-Conviction Hearing Act does not apply to juveniles. See, *e.g., In re W.M.*, 328 Ill. App. 3d 974, 977 (2002) (collecting cases); *supra* ¶ 144 (Freeman, J., dissenting). Thus, Jonathon's claim of plain error is foreclosed if not addressed here. My colleagues in the majority fail to recognize the distinct constitutional repugnance of shackling children. See *supra* ¶¶ 144-150 (Freeman, J., dissenting). The least this court should do is remand for a determination of whether the circuit court knew that Jonathon was shackled during his delinquency proceeding.

¶ 251                              II. Administration of Justice

¶ 252    Second, a supervisory order should issue because this case involves a matter important to the administration of justice. According to this court, the record does not indicate whether the circuit court knew that Jonathon was shackled during his delinquency proceeding. Consequently, absent any affirmative evidence in the record to the contrary, this court presumes that the circuit court "knew and followed the law concerning shackling." *Supra* ¶ 76. This reasoning clearly implies that the trial judge had no affirmative obligation to ascertain whether Jonathon was shackled when he was brought into the courtroom during the course of his juvenile proceeding. Rather, the trial judge could passively abstain from exercising her discretion on the record and defer the subject of courtroom security to the county sheriff. *Supra* ¶ 139 (Freeman, J., dissenting). This reasoning saps credibility from the administration of justice.

¶ 253    Even if the present case involved the criminal prosecution of an *adult* defendant, the law clearly required more from the circuit court than what the record indicates. Generally, a trial court has a fundamental duty to ensure that a criminal defendant's rights are protected and that the defendant receives his or her constitutionally guaranteed fair trial. *Howard v. State*, 79 S.W.3d 273, 287 (Ark. 2002); *Sanders v. People*, 125 P.2d 154, 156 (Colo. 1942). Also, this court has recognized that "control of the courtroom is vested in the trial judge. While the

sheriff may be responsible for courtroom security, it is the trial judge who makes the determination as to how security involving a defendant who is on trial is handled, so as to fully protect his constitutional rights." *Allen*, 222 Ill. 2d at 355-56. Wishing to have it both ways, my colleagues in the majority have recognized these responsibilities of a trial judge but refuse to hold this particular trial judge accountable for abdicating her responsibilities in the case at bar.

¶ 254    Further, the present case does not involve an adult criminal defendant but, rather, a *juvenile*. The concern of safeguarding the rights of the accused is magnified in the context of a juvenile delinquency proceeding. According to my colleagues in the majority: "we reaffirm our case law that if a trial court *is aware or becomes aware* that a defendant, whether an adult or a juvenile, is shackled, the trial court must conduct a *Boose* hearing to determine whether there is a manifest need for the restraint." (Emphasis in original.) *Supra* ¶ 76. I continue to emphatically disagree with lumping juveniles together with adult criminal defendants. My colleagues in the majority display a surprising indifference to the unique status of children in the juvenile justice system. The universally recognized, systemic differences between juvenile delinquency proceedings and adult criminal trials mandate the use of supervisory authority to provide Jonathon the right to meaningful review.

¶ 255    The United States Supreme Court has explained that certain basic constitutional protections enjoyed by adults accused of crimes also apply to juveniles. However, the Federal Constitution does not mandate elimination of all differences in the treatment of juveniles. Rather, a "State has 'a *parens patriae* interest in preserving and promoting the welfare of the child' [citation], which makes a juvenile proceeding fundamentally different from an adult criminal trial." *Schall v. Martin*, 467 U.S. 253, 263 (1984). "The differences between adult and juvenile courts remain; this is because 'although children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability and their needs ***.' " *In re K.G.*, 808 N.E.2d 631, 636 (Ind. 2004) (quoting *Bellotti v. Baird*, 443 U.S. 622, 635 (1979)). The juvenile court system is founded on the American common law doctrine of *parens patriae*. According to the doctrine, the juvenile court may step into the shoes of the parents and further the best interests of the child. The doctrine implies a broad discretion unknown in the adult criminal court system. See *K.G.*, 808 N.E.2d at 635-36.

¶ 256    Again, my colleagues in the majority wish to have it both ways. They emphasize the uniquely protective and rehabilitative nature of juvenile proceedings in denying a general right to a jury in juvenile proceedings. *Supra* ¶¶ 86-97. However, they overlook that, based on this *parens patriae* function, "Illinois courts are under a duty to carefully guard the rights of a minor so as to give minors maximum protection." *In re Sneed*, 48 Ill. App. 3d 364, 366 (1977), *aff'd* 72 Ill. 2d 326 (1978). The constitutional repugnance of shackling is enhanced in the context of a juvenile delinquency proceeding. Unnecessarily shackling children causes both physical and psychological harm, and fosters disrespect for the judicial process. *Supra* ¶ 149 (Freeman, J., dissenting). "If juvenile delinquency proceedings are so different from the criminal justice system as to justify denial of a jury, then juvenile proceedings are sufficiently unique to require a trial judge to ascertain whether a juvenile is physically restrained in the courtroom. My colleagues cannot have it both ways." *Supra* ¶ 150.

¶ 257                            III. Conclusion

¶ 258    The trial court had the constitutional duty to safeguard Jonathon's constitutional rights at his juvenile delinquency hearing.

> "The [trial court] is not an automaton in its judicial function, mechanically responding to encoded instructions fed to it by the counsel before it. In criminal cases, the court has a duty to the State to protect the law, to define it, to enforce it, and to punish the guilty. The [trial court's] duty is also to extend to a defendant in criminal proceedings the full constitutional protections of due process, equal protection, and the presumption of innocence. The court should never indulge in or permit gamesmanship based on technicalities, which in the end may result in injustice to the State or to a defendant." *State v. Nicholls*, 649 P.2d 1346, 1349-50 (Mont. 1982).

The *parens patriae* relationship between Jonathon and the trial court magnified those duties. However, the trial court failed Jonathon in this regard.

¶ 259    This court likewise had a *parens patriae* relationship with Jonathon, which we disregarded. This court has indulged in its own gamesmanship by avoiding a plain-error analysis of Jonathon's shackling issue. By failing Jonathon here, this court has blocked any opportunity, either directly or collaterally, for him to obtain relief. Regrettably, this has resulted in an injustice to Jonathon.

¶ 260    For the foregoing reasons, this court should exercise its supervisory authority to retain jurisdiction over this case and remand so that the circuit court may state for the record whether it knew that he was shackled during his juvenile proceeding. If so, then I believe that the court committed plain error entitling Jonathon to a new juvenile proceeding. Therefore, I dissent from this court's denial of Jonathon's petition for rehearing.


¶ 261    JUSTICE BURKE, dissenting upon denial of rehearing:

¶ 262    Like Justice Freeman, I would allow Jonathon's petition for rehearing. The majority held in its opinion, "[Without] *affirmative indication* in the record that the trial court was aware of the shackles before Jonathon was called to testify, *** we presume that the trial court acted properly and did not commit error with regard to Jonathon's shackling." (Emphasis added.) *Supra* ¶ 72. In response, Jonathon makes a simple request in his petition–retain jurisdiction over the case and remand to the circuit court so the court may state on the record whether it was aware that Jonathon was shackled at the outset of the proceedings. Denying this request, the majority prefers to continue to "presume that the trial court acted properly." In my view, the majority's position is untenable.

¶ 263    Relying on the presumption that the trial court acted properly might be appropriate if Jonathon were an adult who could bring a petition under the Post-Conviction Hearing Act. In a post-conviction hearing, evidence outside the record–such as an affidavit from trial counsel or perhaps even the trial court judge–could be presented to prove that the court was aware of the shackles and error occurred. But as a juvenile, that opportunity is foreclosed to

-54-

Jonathon. Thus, based on the majority's *presumption* that the trial court did not err, Jonathon has no opportunity–either directly or collaterally–to obtain relief. In my view, therefore, Jonathon's request for a remand should be granted and he should be allowed the opportunity to make a record to show that the trial court was aware of Jonathon's shackles at the outset and erred by not conducting a *Boose* hearing or requiring the shackles to be removed.

¶ 264   Further, as Justice Freeman points out, allowing minors to be shackled throughout juvenile proceedings cannot be reconciled with the majority's stance that juveniles are not entitled to jury trials because " '[d]elinquency proceedings are *** protective in nature and the purpose of the Act is to correct and rehabilitate, not to punish.' " *Supra* ¶ 94 (quoting *In re Rodney H.*, 223 Ill. 2d 510, 520 (2006)). If the majority truly believes that juvenile court proceedings should be " 'administered in a spirit of humane concern for, and promote the welfare of, the minor' " (emphasis omitted) (*supra* ¶ 92 (quoting *In re A.G.*, 195 Ill. 2d 313, 317 (2001))), then, at the very least, it should remand to determine whether the trial court fulfilled its obligation to conduct the proceedings in that same spirit.

¶265   As I noted in my previous dissent, unnecessary shackling is fundamentally and inherently prejudicial because it "offends the dignity of the judicial process" (*Boose*, 66 Ill. 2d at 265-66) and can have damaging psychological effects on the defendants (see *Deck*, 544 U.S. at 631). The psychological effects are even greater for minors and often exacerbate feelings of isolation, hopelessness, and insecurity. Thus, if the court was aware of the shackles, but did not hold a *Boose* hearing or order the shackles removed, the court committed plain error and Jonathon should be granted a new trial.